**2015-1242**

In The

# United States Court of Appeals

### For The Federal Circuit

## CLICK-TO-CALL TECHNOLOGIES, LP,

*Appellant,*

**v.**

## ORACLE CORPORATION, ORACLE OTC SUBSIDIARY, LLC, INGENIO, INC., YELLOWPAGES.COM, LLC,

*Appellees.*

### APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD
### IPR2013-00312
### Patent No. 5,818,836

––––––––––––––––––

## BRIEF OF APPELLANT

––––––––––––––––––

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a)(1) and Federal Rule of Appellate Procedure 36.1, counsel for Appellant Click-To-Call Technologies LP certifies the following:

1. The full name of every party represented by me is:

   **Click-To-Call Technologies LP**

2. The name of the real party in interest represented by me is:

   **Click-To-Call Technologies LP**

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

   **None**

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency, or are expected to appear in this Court, are:

   **Lee & Hayes, PLLC: Peter Ayers, Reid Johnson**

   **Yudell Isidore Ng Russell, PLLC: Craig Yudell, Eustace Isidore**

Dated: March 9th, 2015

/s/ Peter Ayers
Peter J. Ayers

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES ................................................................ v

STATEMENT OF RELATED CASES .................................................. x

I.    STATEMENT OF JURISDICTION ............................................. 1

II.   STATEMENT OF THE ISSUES ................................................. 1

III.  STATEMENT OF THE CASE ...................................................... 2

    A.   Overview ......................................................................... 2

    B.   Statement of Facts ........................................................ 5

        1.   Summary of the '836 Patent ..................................... 5

        2.   Prior History of Litigation over the '836 Patent with Petitioner ......................................................... 6

        3.   Prior Reexamination of the '836 Patent by Petitioner ............... 7

        4.   Relevant Procedural History of the *Inter Partes* Review .......... 8

IV.   SUMMARY OF THE ARGUMENT ........................................... 11

V.    ARGUMENT .......................................................................... 12

    A.   Standard of Review ...................................................... 12

    B.   This Court has Jurisdiction to Review the Board's Final Written Decision Holding that Petitioner was Not Statutorily Barred from *Inter Partes* Review Under 35 U.S.C. § 319 and 5 U.S.C. § 706(2)(C) of the APA ...................................................... 13

C.    The Board Erred by Disregarding the Unambiguous Congressional Intent of Section 315(b)'s Jurisdictional Bar ............. 16

     1.    *Chevron* Analysis Applies ........................................................ 17

     2.    Congress's Intent is Unambiguous: Service of a Complaint Triggers Section 315(b) ........................................... 17

         a.    The text of Section 315(b) is clear on its face ................ 18

         b.    Related Section 315(a) provides additional support for the plain meaning of Section 315(b) ........................ 20

         c.    Legislative history also supports the notice function of Section 315(b) ............................................. 22

     3.    The Board is not entitled to *Chevron* deference because Section 315(b)'s plain meaning controls ................................... 25

     4.    The Board's Interpretation of Section 315(b) is Unreasonable Because It Does Not Account for Petitioner's Actual Notice ......................................................... 26

         a.    Voluntary dismissals cannot erase the fact that the defendant received actual notice of the infringement claims through service of the complaint .................................................................... 27

         b.    The Board erroneously relied on Federal Circuit authority governing the dismissal of an appeal that was time-barred ............................................................. 28

         c.    After a case is voluntarily dismissed under Rule 41(a) in district court, the court retains jurisdiction to issue binding decisions based on the parties' actions during the case .................................................. 30

     5.    Under the Proper Interpretation of Section 315(b), the Board Lacked Jurisdiction ......................................................... 32

VI.    CONCLUSION...............................................................................................33

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABBOTT Labs. v. Gardner*,
387 U.S. 136 (1967)....................................................................13

*Amkor Tech., Inc. v. Tessera, Inc.*,
UOR2013-00242 (P.T.A.B. Jan. 31, 2014) ...................................19

*Bonneville Associates, LP v. Barram*,
165 F.3d 1360 (Fed. Cir. 1999) ....................................... 28, 29, 30

*Bowen v. Michigan Acad. of Family Physicians*,
476 U.S. 667 (1986)....................................................................13

*Chevron U.S.A. Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984)................................................ 17, 18, 25, 26

*City of Arlington v. F.C.C.*,
-- U.S. --, 133 S. Ct. 1863 (2013) .................................................17

*Cooper Technologies Co. v. Dudas*,
536 F.3d 1330 (Fed. Cir. 2008) ............................................ 18, 20

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990)...........................................................30, 31

*Delverde, SrL v. United States*,
202 F.3d 1360 (Fed. Cir. 2000) ....................................................18

*Dickinson v. Zurko*,
527 U.S. 150 (1999)....................................................................14

*Eurodif S.A. v. U.S.*,
423 F.3d 1275 (Fed. Cir. 2005) ....................................................17

*GEA Process Eng'g, Inc. v. Steuben Foods, Inc.*,
   IPR2014-00041 (PTAB Dec. 23, 2014) ......................................................15

*Graves v. Principi*,
   294 F.3d 1350 (Fed. Cir. 2002) ..................................................... 28, 29, 30

*Hawkins v. United States*,
   469 F.3d 993 (Fed. Cir. 2006) ....................................................................18

*Motorola Mobility LLC v. Arnouse*,
   IPR2013-0010 (PTAB Jan. 30, 2013) .........................................................23

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)....................................................................................27

*Nelson v. Napolitano*,
   657 F.3d 586 (7th Cir. 2011) ......................................................................31

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005) ..................................................................18

*Russello v. United States*,
   464 U.S. 16 (1983).....................................................................................20

*Sackett v. E.P.A.*,
   132 S. Ct. 1367 (2012)................................................................................13

*Schaefer Fan Co., Inc. v. J&D Mfg.*,
   265 F.3d 1282 (Fed. Cir. 2001) ..................................................................31

*Sequa Corp. v. Cooper*,
   245 F.3d 1036 (8th Cir. 2001) ....................................................................31

*St. Jude Medical, Cardiology Div., Inc. v. Volcano Corp.*,
   749 F.3d 1373 (Fed. Cir. 2014) ..................................................................13

*Szabo Food Serv., Inc. v. Canteen Corp.*,
   823 F.2d 1073 (7th Cir. 1987) .............................................................. 27, 31

*Timex V.I., Inc. v. United States*,
    157 F.3d 879 (Fed. Cir. 1998) .......................................................................18

*United States v. Clark*,
    454 U.S. 555 (1982)........................................................................................18

*U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*,
    775 F.3d 128 (2d Cir. 2014) ..........................................................................31

*Williams v. Taylor*,
    529 U.S. 420 (2000)........................................................................................18

## STATUTES

5 U.S.C. § 706...................................................................................................14

5 U.S.C. §§ 706(2)(A)-(D)................................................................................13

5 U.S.C. § 706(2)(C) ................................................................................. 13, 14

28 U.S.C. § 1295(a)(4)..................................................................................1, 14

35 U.S.C. § 102(e) .........................................................................................2, 8

35 U.S.C. § 103(a) ..............................................................................................8

35 U.S.C. § 141 ................................................................................................14

35 U.S.C. § 141(c) ..............................................................................................1

35 U.S.C. § 142 ..................................................................................................1

35 U.S.C. § 144 ................................................................................................14

35 U.S.C. § 312(a)(2)........................................................................................15

35 U.S.C. § 314 ..................................................................................................1

35 U.S.C. § 315 ...................................................................................... 1, 20, 21

35 U.S.C. § 315(a) ............................................................. 3, 20, 22, 24

35 U.S.C. § 315(a)(1) ............................................................. 21

35 U.S.C. § 315(a)(2) ............................................................. 21

35 U.S.C. § 315(b) ............................................................. *passim*

35 U.S.C. § 318(a) ............................................................. 1, 13

35 U.S.C. § 319 ............................................................. 1, 13, 14

## RULES

Fed. R. Civ. P. 3 ............................................................. 21

Fed. R. Civ. P. 4 ............................................................. 21

Fed. R. Civ. P. 11 ............................................................. 4, 31

Fed. R. Civ. P. 41(a) ............................................................. 10, 30

Fed. R. Civ. P. 41(a)(1) ............................................................. *passim*

Fed. R. Civ. P. 41(a)(1)(i) ............................................................. 28

Fed. R. Civ. P. 60 ............................................................. 4

Fed. R. Civ. P. 60(b) ............................................................. 31

Fed. R. Civ. P. 65(c) ............................................................. 31

## REGULATIONS

37 C.F.R. § 42.3(b) ............................................................. 15, 32

37 C.F.R. § 42.3 ............................................................. 32

37 C.F.R. § 42.73 ............................................................. 1

37 C.F.R. § 42.101(b) ............................................................... 8, 9, 10, 32

37 C.F.R. § 42.108 ...................................................................................1

37 C.F.R. § 90.3 ......................................................................................1

## LEGISLATIVE HISTORY

157 Cong. Rec. S1375 (daily ed. Mar. 8, 2011) .....................................22

157 Cong. Rec. S5429 (daily ed. Sept. 8, 2011).....................................22

Meeting of H. Comm on the Judiciary
    Transcript Markup of H.R. 1249 (April 14, 2011) .......................23

House Report No. 112-98 (2011) (Conf. Rep.) .....................................23

## SECONDARY SOURCE

Black's Law Dictionary 1491 (9th Ed. 2009).........................................19

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5(a), appellant states:

A.    There have been no previous appeals in this proceeding.

B.    U.S. Patent No. 5,818,836 ("the '836 Patent") has been asserted in the following civil actions currently pending in U.S. District Court for the Western District of Texas:

1.    *Click to Call Technologies LP* v. *Oracle Corporation, Oracle OTC Subsidiary LLC, Dell Inc., Carnival Cruise Lines, The Hartford Financial Services Group, Inc.; BMO Harris Bank N.A.; Allstate Insurance Company, Esurance Insurance Services, Inc., HSBC Finance Corporation, and Macy's Inc.,* Civil Action No. 1:12-cv 00468-SS, filed on May 29, 2012.

2.    *Click to Call Technologies LP v. AT&T, Inc.; YP Holdings LLC, Ingenio, Inc.; Yellowpages.Com LLC, Ether, a division of lngenio, Inc.; and Ingenio, Inc., doing business as Keen,* Civil Action No. 1:12-cv-00465-SS, filed on May 29, 2012.

# I.     STATEMENT OF JURISDICTION

The Patent Trial and Appeal Board (the "Board") asserted jurisdiction under 35 U.S.C. § 314 and issued its Decision: Institution of Inter Partes Review (hereinafter the "Institution Decision") pursuant to 37 C.F.R. § 42.108. (A284-290). The Board then asserted jurisdiction and issued its Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 on October 28, 2014. (Add. 1-29; A001-029). Click-to-Call Technologies LP ("Click-to-Call") timely filed a notice of appeal on November 25, 2014, pursuant to 35 U.S.C. § 142 and 37 C.F.R. § 90.3, which was received and docketed by this Court on January 8, 2015. (A306-312). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4), 35 U.S.C. § 319, and 35 U.S.C. § 141(c).

# II.     STATEMENT OF THE ISSUES

Section 315 of Title 35 prohibits the Board from having jurisdiction over an *inter partes* review "if the petition requesting the proceeding is filed more than one year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent." 35 U.S.C. § 315(b). The issue presented is whether the Board erred in its final written decision when it held that service of a complaint alleging infringement of the '836 patent did not, as a matter of law, trigger this one year statutory time bar to filing the petition in this case because that complaint was later dismissed without

prejudice, thereby nullifying the prior service, even though neither the text nor the legislative history makes such an exception.

## III.   STATEMENT OF THE CASE

### A.   Overview.

Click-to-Call appeals from a final written decision in an IPR in which the Board found that certain claims of the '836 Patent were anticipated by and/or rendered obvious over the prior art and therefore unpatentable. In its final written decision, the Board primarily relied on one prior art reference, Dezonno. Click-to-Call argued that Dezonno does not qualify as prior art under 35 U.S.C. § 102(e) because the inventor conceived of his invention prior to Dezonno's filing date and was diligent in reducing his invention to practice. (A291-300). The Board ultimately held that Click-to-Call could not antedate Dezonno because there was insufficient evidence of continuous diligence during the entire critical period and, therefore, Dezonno qualified as prior art. (A001-029). Click-to-Call does not appeal the merits of that decision because the Board lacked jurisdiction and authority to review the '836 Patent.

In its final written decision, the Board held that Ingenio LLC (now YP Interactive LLC), was not barred from pursuing an *inter partes* review under 35 U.S.C. § 315(b), even though it was served with a complaint alleging infringement of the '836 Patent more than one year before filing its petition for IPR. (A012-

2

013). In reaching this decision, the Board ignored the plain language of the statute, Congress' intent, and the legislative history regarding § 315(b). (A012-013). Instead, the Board relied on the fact that the underlying civil action had been voluntarily dismissed without prejudice as part of a global settlement between the parties. (A012-013). Focusing solely on the dismissal, the Board engaged in a legal fiction and treated the civil action "as something that, *de jure*, never existed." (A012). Because the legal action "never existed" in this fiction, the Board felt free to ignore the actual service of the complaint and held that Petitioner YP Interactive LLC was not barred under § 315(b).

The Board's interpretation of Section 315(b) was flawed for several reasons. First, the Board did not interpret the plain text of the statute or devine the Congressional intent behind the statute to determine its meaning or scope. Had it done so, it would have noted that both the language of and the intent behind Section 315(b) was to provide notice to the defendant of claims against it and a limited opportunity to evaluate them and respond. This is precisely why the terms "served with a complaint alleging infringement of the patent" were used rather than "filed a civil action," which Congress used in Section 315(a). Congress carefully drafted Section 315(b) to effectuate its purpose of making service of the complaint the trigger of the one-year statutory period, without any effect of a

subsequent dismissal. The Board failed to make this analysis, despite the clear terms of Section 315(b) and the supportive Congressional intent.

Second, the Board's reliance on a legal fiction to negate petitioner's notice of the infringement complaint was unreasonable. Section 315(b)'s trigger is notice of patent infringement obtained through service of process. A voluntary dismissal without prejudice may remove the parties' tentative legal relationship with respect to the civil action, but it cannot negate the triggering event that started the statute of limitations. As applied here, a voluntary dismissal cannot negate the fact that Ingenio LLC received actual notice of the infringement allegations against it and was aware of its opportunity to respond. The decisions relied upon by the Board do not provide support for its interpretation. In fact, in district court actions, even after a party voluntarily dismisses the case without prejudice, the court may still retain jurisdiction to issue binding decisions regarding events of the case, such as Rule 11 violations, attorney fees and costs, Rule 60 motions, or to oversee settlement disputes. Thus, the subsequent effect of a voluntary dismissal is limited to its specific application and it cannot negate the event that triggered the one-year period under Section 315(b).

No decision has extended this legal fiction and nullified the effect of service of process. This is not surprising because a party cannot "nullify" the knowledge obtained from receiving a complaint for patent infringement, especially after it

challenges validity, such as here. This extension of the legal fiction to trump the unambiguous text of Section 315(b) was unreasonable, and this error rendered all decisions made thereafter in violation of the Board's jurisdiction.

On appeal, Click-to-Call requests that this Court vacate the Board's decision that *inter partes* review was not statutorily barred under Section 315(b) because petitioner YP Interactive LLC was in fact served with a complaint alleging infringement of the '836 Patent more than one year prior to filing the petition for IPR.

**B.    Statement of Facts.**

**1.    Summary of the '836 Patent.**

The U.S. Patent and Trademark Office ("PTO") issued the '836 Patent on October 6, 1998. (A046-070). The '836 Patent generally covers a system and method for establishing a telephony voice connection between two parties using an on-line data service to initiate the connection. (A080). The first party, using a data terminal, receives over the Internet certain publicly available information including first and second information regarding the second party, which is visually associated with a user selectable element, such as an icon, in the user's graphical user interface. (A080). After the user selects the user-selectable element, the on-line data service sends a command to a voice system. (A080). Next, a first

telephone call for the first party and a second telephone call for the second party are established, and the voice system connects the two telephone calls. (A080).

### 2.    Prior History of Litigation over the '836 Patent with Petitioner.

A few short years after the patent issued, the inventor and owner of the '836 Patent, Stephen DuVal, granted an exclusive license under the '836 Patent to Inforocket.com, Inc. ("InfoRocket"). (A287). Soon thereafter, on June 8, 2001, InfoRocket filed a civil action and served Keen, Inc. ("Keen") with a complaint alleging infringement of the '836 Patent in the United States District Court for the Southern District of New York, *Inforocket.Com, Inc. v. Keen, Inc.*, CA No. 1:01-cv-05130-LAP (S.D.N.Y.) (the "5130 Action"). (A090-145, A301-302). On October 26, 2001, Keen filed its Answer and asserted a counterclaim for a declaratory judgment of non-infringement and invalidity of the '836 Patent. (A136-145). The merits of InfoRocket's infringement allegations were heard and ruled on as part of InfoRocket's preliminary injunction motion. (A032).

In response to the 5130 Action, Keen brought its own suit for infringement against InfoRocket, *Keen, Inc. v. Inforocket.Com, Inc.*, CA No. 1:01-cv-8226-LAP (S.D.N.Y.) (the "8226 Action"). (A034-42). The 8226 Action proceeded on the same track before the same judge as in the 5130 Action. (A030-42). In the 8226 Action, the court granted InfoRocket's motion for summary judgment on July 31,

2002, and Keen filed a Notice of Appeal to the Federal Circuit on August 23, 2002. (A040-41).

While its appeal was pending, Keen acquired InfoRocket in 2003 as its wholly-owned subsidiary. (A287). Thereafter, subject to the terms of the merger, InfoRocket and Keen stipulated to a voluntarily dismissal of both suits "without prejudice" on the same day, March 21, 2003. (A033, A041, A043-44). Later in 2003, Keen changed its name to Ingenio, Inc. (A287).

On May 29, 2012, Click-to-Call asserted the '836 Patent against multiple parties, including Ingenio, LLC, in the U.S. District Court for the Western District of Texas, *Click to Call Technologies LP v. AT&T, Inc.; YP Holdings LLC; Ingenio, Inc.; Yellowpages.Com LLC; Ether, a division Ingenio, Inc.; and Ingenio, Inc., doing business as Keen*, Civil Action No.1:12-cv-00465-SS, filed on May 29, 2012 (the "Pending Civil Action"). (A286, A295). In the infringement suit, Ingenio LLC admitted that the correct name of Ingenio, Inc. is actually Ingenio, LLC (hereinafter "Ingenio"). (A287-88). During the Pending Civil Action, Ingenio changed its name to YP Interactive LLC ("YP Interactive"). (A012). This Pending Civil Action is currently stayed.

### 3.    Prior Reexamination of the '836 Patent by Petitioner.

Not long after Keen acquired InfoRocket, a dispute between Keen (now Ingenio) and Mr. Duval developed over ongoing royalty payments for the '836

Patent. As a result of the dispute, Ingenio once again challenged the '836 Patent by requesting *ex parte* reexamination on April 6, 2004. The PTO granted Ingenio's request under Control No. 90/007,012 (the "Reexamination"). (A192-277). During the Reexamination, the inventor amended certain claims and added claims, and also successfully overcame all rejections, including those applying two of the references Petitioner asserted in the IPR Petition – Dezonno and Blinken. (*Id.*). As reflected in the PTO's reexamination certificate, dated December 30, 2008, the '836 Patent emerged from the Reexamination with 24 enforceable claims. (A087-89).

### 4.    Relevant Procedural History of the *Inter Partes* Review.

On May 28, 2013, Ingenio, together with Oracle Corporation, Oracle OTC Subsidiary LLC, and Yellowpages.com LLC (collectively "Petitioner"), filed its Petition for Inter Partes Review of U.S. Patent No. 5,818,836 ("Petition"). (A285). The Petition requested review of claims 1, 2, 8, 12, 13, 15, 16, 18, 19, 22-24, and 26-30 of the '836 Patent based on 35 U.S.C. §§ 102(e) and 103(a). (A285).

Patent Owner Click-to-Call filed its Preliminary Response on August 30, 2013. (A076-86). Click-to-Call challenged the Board's jurisdiction to review the '836 Patent based on 35 U.S.C. § 315(b), Petitioner's standing under 37 C.F.R. § 42.101(b), and whether there was a reasonable likelihood that Petitioner would prevail with respect to the claims challenged in the Petition. (A080-86).

Specifically, Click-to-Call presented evidence that Ingenio was served with a complaint alleging infringement of the '836 Patent in 2001 and as a result, institution of *inter partes* review was prohibited by 35 U.S.C. § 315(b), and also because Petitioner lacked standing under 37 C.F.R. § 42.101(b). (*Id.*).

The Board then requested a conference call to discuss, among other things, whether Petitioner was barred from filing an *inter partes* review for the '836 Patent. (A279). Click-to-Call presented an accurate timeline for the Board's analysis of the events, and its accuracy was confirmed by Petitioner. (A279-80). The Board then requested additional briefing from each side. (A280). Both Petitioner and Click-to-Call submitted additional briefing on the issue in compliance with the Board's request. (A288).

The Board issued its Institution Decision on October 30, 2013. (A284-290). The Board held that the Petition established a "reasonable likelihood that Petitioners will prevail in challenging claims 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 as unpatentable." (A285). However, Petitioner failed to "establish that there is a reasonable likelihood that Petitioners will prevail in challenging claims 18, 24, 27, and 28 as unpatentable." (*Id.*). In addition, although the Board found that Ingenio was served with a complaint alleging infringement of the '836 Patent more than one year prior to the filing of the Petition, it held that the service was effectively nullified because the infringement suit was dismissed voluntarily

pursuant to a joint stipulation under Fed. R. Civ. P. 41(a). (A289). The Board concluded that the 35 U.S.C. § 315(b) statutory bar was inapplicable and instead instituted review of claims 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30, but not claims 18, 24, 27, and 28. (A285, A289). Click-to-Call requested rehearing of the Board's decision regarding application of § 315(b), but the Board denied Click-to-Call's request. (A012).

Click-to-Call filed its Patent Owner Response on January 16, 2014. (A291-300). Click-to-Call again requested dismissal of the Petition because the Board lacked statutory authority to review the '836 Patent under Section 315(b), and because Petitioner lacked standing under 37 C.F.R. § 42.101(b). (A293-300). In addition, Click-to-Call contended that the primary prior art reference, Dezonno, does not in fact qualify as prior art because the inventor of the '836 Patent conceived his invention prior to Dezonno's effective filing date and exercised diligence in reducing it to practice. (A292). Petitioners filed a Reply to the Patent Owner Response, and an oral hearing was held on June 26, 2014. (A002, 303-305).

On October 28, 2014, the Board issued a Final Written Decision, again asserting its jurisdiction. (Add. 1-29; A001-029). The Board held that Section 315(b) posed no bar to its jurisdiction, and stated "because this patent infringement suit was dismissed without prejudice, Federal Circuit precedent interprets such a dismissal as leaving the parties in the same legal position as if the underlying

complaint had never been served." (Add. 13; A013). The Board also held that Click-to-Call did not demonstrate continuous exercise of reasonable diligence in its attempt to antedate the Dezonno reference. (Add. 26; A026). As a result, Dezonno did qualify as prior art and, therefore, claims 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 were anticipated and obvious over Dezonno and the combination of Dezonno and the Mosaic Handbook. (Add. 26-37; A026-27).

Thereafter, Click-to-Call timely filed its Notice of Appeal on November 25, 2014. (A306-312).

## IV.    SUMMARY OF THE ARGUMENT

This court should vacate the Board's Final Written Decision holding Petitioner not barred from pursuing *inter partes* review of the '836 Patent under 35 U.S.C. § 315(b) because Petitioner YP Interactive was served with a complaint alleging infringement of the '836 Patent more than one year prior to filing the Petition for IPR.

Congress outlined a clear mechanism for patent owners to protect themselves from repeated attacks on its patents—§ 315(b). In doing so, it required all parties who are served with a complaint, and given notice of the infringement claims raised against it, to petition for IPR within one year. Petitioner YP Interactive, formally known as Ingenio, was served with a complaint alleging infringement of the '836 Patent in 2001, more than one year prior to the date of the

11

Petition. (A301-302). No further inquiry was necessary; that alone triggered the § 315(b) statutory bar.

Rather than follow the unambiguous language of Section 315(b), the Board engaged in a legal fiction to invoke its jurisdiction over the IPR that finds no support in the statutes, rules, legislative history, or the policy behind the legislation. The Board held that because the parties voluntarily dismissed the underlying suit without prejudice, it is as if it never existed, and under this legal fiction service of the complaint was nullified. (A012-13). The Board relied on decisional law analyzing Rule 41(a)(1) dismissals, in contravention of the clear language of the statute and the Congressional intent supporting the precise language. By failing to apply the applicable statutory bar to the IPR, the Board exceeded its statutory authority to review the '836 Patent in contravention of its jurisdiction. For these reasons, the Board's final written decision must be vacated because the Board did not have jurisdiction to institute *inter partes* review, or take any action thereafter.

## V.    ARGUMENT

### A.    Standard of Review.

Under the Administrative Procedure Act ("APA"), the reviewing court shall set aside agency action (as opposed to underlying factual issues associated with obviousness) if it is found to be "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A)-(D).

**B.    This Court has Jurisdiction to Review the Board's Final Written Decision Holding that Petitioner was Not Statutorily Barred from *Inter Partes* Review Under 35 U.S.C. § 319 and 5 U.S.C. § 706(2)(C) of the APA.**

There is a "strong presumption" that Congress intends judicial review of administrative action. *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *Sackett v. E.P.A.*, 132 S. Ct. 1367, 1369 (2012). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Bowen*, 476 U.S. at 670. (quoting *ABBOTT Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). The agency bears a "heavy burden" in overcoming this strong presumption. *Id.*

This Court will review the Patent Trial and Appeal Board's final written decision. *See* 35 U.S.C. § 319 ("A party dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 318(a) may appeal the decision pursuant to sections 141 through 144."). This Court has held that it has authority to review decisions from the "second step" of the procedure for *inter partes* review. *St. Jude Medical, Cardiology Div., Inc. v. Volcano Corp.*, 749 F.3d 1373, 1375-76 (Fed. Cir. 2014). This "second step" includes "the Board's conduct of the

13

proceeding and [its] decision with respect to patentability." *Id.* Therefore, this Court has authority to review the Board's final written decision and specifically, issues pertaining to the conduct of the proceeding contained in the final written decision.

Here, in its final written decision, the Board analyzed whether one of the petitioners, YP Interactive, was statutorily barred from review under Section 315(b). (Add. 12-13; A012-13). The Board ultimately held that "YP Interactive LLC is not barred from pursuing an *inter partes* review of the '836 patent under § 315(b)." (Add.13; A013). The Board's decision regarding its jurisdiction pertains to the conduct of the proceeding and is subject to review by this Court under 35 U.S.C. §§ 319, 141, 144.

Notwithstanding these provisions, this Court also has authority to review this issue under the APA. The PTO is an agency subject to the Administrative Procedure Act, 5 U.S.C. § 706. *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999). This Court[1] must "decide all relevant questions of law, including interpreting constitutional and statutory provisions" and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C).

---

[1] This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1295(a)(4).

Petitioner must meet the standards of 35 U.S.C. § 315(b) for the Board to exercise its jurisdiction. Section 315(b) provides:

> An inter partes review may not be instituted if the petition requesting the proceeding is *filed more than 1 year after the date on which* the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent.

(emphasis added). This statute clearly requires the petition to be filed within a specific time period. As provided in its own regulation, titled "Jurisdiction," the PTO states that "[a] petition to institute a trial must be filed with the Board consistent with any time period required by statute." 37 C.F.R. § 42.3(b). Because Section 315(b) prescribes a specific time period, compliance is required for the Board to confer jurisdiction over an IPR. The Board maintains authority to review its jurisdiction subsequent to the institution decision and throughout the IPR. *See GEA Process Eng'g, Inc. v. Steuben Foods, Inc.*, IPR2014-00041 at *22 (PTAB Dec. 23, 2014) (Paper 135) (terminating *inter partes* review under § 312(a)(2) after the institution decision because the Board did not have statutory authority to consider a petition that did not identify all real parties-in-interest). Thus, any action, such as the final written decision, executed in violation of Section 315(b) is necessarily in excess of the Board's jurisdiction and *ultra vires*. Because the Board's actions exceeded its authority and jurisdiction, review is appropriate.

**C.    The Board Erred by Disregarding the Unambiguous Congressional Intent of Section 315(b)'s Jurisdictional Bar.**

When Congress enacted the Leahy-Smith America Invents Act ("AIA"), it equipped patent owners with few jurisdictional defenses. However, it did outline one clear mechanism for patent owners to protect themselves from repeated attacks on its patents—35 U.S.C. § 315(b). In doing so, it required all parties who are served with a complaint, and given notice of the infringement claims raised against it, to petition for IPR within one year. Congress carefully crafted this clear and undeniable protection for patent owners, and its intent is apparent from the statutory text, the statutory scheme, and its legislative history. When this statutory bar is invoked, the Board is without jurisdiction to institute trial or carry out any action in an effort to review the patents at issue.

However, in the underlying proceeding, the Board disregarded the unambiguous language of Section 315(b) by inserting an analysis of a legal fiction that has no bearing on *inter partes* review. Petitioner YP Interactive was served with a complaint alleging infringement of the '836 Patent more than one year prior to the petition date, satisfying the statutory mandate prescribed by Congress. No further inquiry was necessary; the plain meaning of Section 315(b) fully controlled the analysis. However, the Board's construction of Section 315(b) inexcusably disregarded the unequivocal statutory language, and instead found that because the underlying suit was voluntarily dismissed without prejudice, it is as if it never

16

existed, and service of the complaint was nullified. By failing to apply the applicable statutory bar, the Board exceeded its statutory authority by reviewing the '836 Patent in contravention of its own jurisdiction. As such, this Court should properly analyze Section 315(b) and reverse the Board's jurisdictional decision.

### 1. *Chevron* Analysis Applies.

When a court reviews an agency's construction of a jurisdictional statute by adjudication, its analysis is guided by *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984). *See City of Arlington v. F.C.C.*, -- U.S. --, 133 S. Ct. 1863, 1868 (2013); *Eurodif S.A. v. U.S.*, 423 F.3d 1275, 1277 (Fed. Cir. 2005). The *Chevron* analysis requires the reviewing court to (1) ascertain whether Congress' plain terms expressed an unambiguous intention regarding the precise question at issue, and, if not, (2) determine whether the agency's interpretation is reasonable and, therefore, entitled to deference. *Eurodif*, 423 F.3d at 1277. If the court determines that the statute is unambiguous on the question at issue, it does not defer to the agency's interpretation, regardless of whether that interpretation is reasonable. *Id.*

### 2. Congress's Intent is Unambiguous: Service of a Complaint Triggers Section 315(b).

When determining whether Congress has spoken to the issue at hand, courts "do so by employing the traditional tools of statutory construction; [Courts] examine the statute's text, structure, and legislative history, and apply the relevant

canons of interpretation." *Cooper Technologies Co. v. Dudas*, 536 F.3d 1330, 1337 (Fed. Cir. 2008) (quoting *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000)). If Congress had an intention on the question at issue, "that intention is the law and must be given effect . . . ." *Hawkins v. United States*, 469 F.3d 993, 1000 (Fed. Cir. 2006) (quoting *Chevron*, 467 U.S. at 843 n.9). Only if, *after* this investigation, the court concludes that Congress had no intent on the matter, or its purpose and intent is unclear, will the court proceed to the issue of *Chevron* deference. *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998).

### a.  *The text of Section 315(b) is clear on its face.*

In interpreting a statute, the court must first review the language of the statute itself, "giv[ing] the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1314-15 (Fed. Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000)). "Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." *Timex*, 157 F.3d at 882. Thus, if the statutory language is clear, the plain meaning of the words chosen by Congress is conclusive of the scope of the statute. *U.S. v. Clark*, 454 U.S. 555, 560 (1982).

Here, the operative terms of Section 315(b) contain absolutely no reference to any subsequent effect of a Fed. R. Civ. P. 41(a)(1) dismissal, leaving service of the complaint as the sole trigger:

> An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent.[2]

The text of the relevant portion of Section 315(b) is unambiguous: *inter partes* review may not be instituted more than one year after the date on which the petitioner "is served with a complaint alleging infringement of the patent." The operative terms at issue, "served" and "complaint," each are clear. For instance, Black's Law Dictionary defines "serve" as "[t]o make legal delivery of (a notice or process)" or "[t]o present (a person) with a notice or process as required by law" and "service" as "[t]he formal delivery of a writ, summons, or other legal process[.]" Black's Law Dictionary, 1491 (9th Ed. 2009). Black's Law Dictionary defines "complaint" as "[t]he initial pleading that starts a civil action and states the basis for the court's jurisdiction, the basis for the plaintiff's claim, and the demand for relief." *Id.* at 323. In fact, the Board has already interpreted this phrase as such: "the legally-charged text 'served with a complaint' is used ordinarily in connection with the official delivery of a complaint in a civil action." *See Amkor Tech., Inc. v. Tessera, Inc.*, IPR2013-00242, slip. op. at 9 (P.T.A.B. Jan. 31, 2014) (Paper 98).

---

[2] For ease of reference, Section 315(b) is provided again.

Thus, the plain meaning of "served with a complaint alleging infringement of the patent" clearly prescribes that Section 315(b) is implicated once the party receives notice through official delivery of a complaint in a civil action. The plain meaning of Section 315(b) focuses exclusively on the initial act of service of a complaint. It does not contain any reference or indication that Section 315(b) is subject to any subsequent legal fiction stemming from a dismissal under Fed. R. Civ. P. 41(a)(1), or any other subsequent act or ruling. As such, this court does not need to look any further than the text of the statute itself.  If it does, however, this reading is confirmed by AIA's statutory framework and its legislative history.

> b.    _Related Section 315(a) provides additional support for the plain meaning of Section 315(b)._

The inclusion of the specific phrase, "served with a complaint" in Section 315(b), as compared to its absence in the other subsections of 35 U.S.C. § 315, indicates that Congress intentionally prescribed it in order to emphasize its notice function. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." _Cooper Technologies_, 536 F.3d at 1340 (quoting _Russello v. United States_, 464 U.S. 16, 23 (1983)).

Section 315, titled "Relation to other proceedings or actions," prescribes specific requirements of the _inter partes_ review proceedings as they relate to other

proceedings. Notably, the use of "served with a complaint" is only used in Section 315(b). On the other hand, § 315(a)(1) states that "inter partes review may not be instituted if, before the date on which the petition for such a review is filed, the petitioner or real party in interest *filed a civil action* challenging the validity of a claim of the patent." *See also* § 315(a)(2) (also utilizing the term "files a civil action" with respect to a stay of the action); Fed. R. Civ. P. 3 ("A civil action is commenced by *filing* a complaint with the court.") (emphasis added).

These different terms, "filed a civil action" and "served with a complaint", used in different subsections of Section 315, are similar in that they both require initiation of an action to trigger their bar to instituting *inter partes* review, rather than any subsequent effect of said action. However, the terms are different in that they specify different actions for triggering the bar. With respect to Section 315(b), the term used by Congress, "served with a complaint," provides more specificity for the action required to trigger the statutory bar because service of the complaint can only occur after the complaint is filed with the court. *See* Fed. R. Civ. P. 4. Therefore, while the related subsections of Section 315 both pertain to the initiation of a civil action without reference to any subsequent effect of a voluntary dismissal, subsection (b) requires the more narrow interpretation, as it pertains specifically and intentionally to the notice function provided by service of the complaint.

21

c.    *Legislative history also supports the notice function of Section 315(b).*

The legislative history of Section 315(b) indicates that the terms of the statute were carefully drafted to provide notice and opportunity to the accused infringer to identify and understand the relevant patent claims stemming from the complaint, and to prevent harassment of patent owners. For instance, Senator Jon Kyl explained Congress' adoption of the one-year bar by stating, "in light of the present bill's enhanced estoppels, it is important that the section 315(b) deadline afford defendants a reasonable opportunity to identify and understand the patent claims that are relevant to the litigation." *See* 157 Cong. Rec. S5429 (daily ed. Sept. 8, 2011) (stmt. of Sen. Kyl); *see also* 157 Cong. Rec. S1375 (daily ed. Mar. 8, 2011) (stmt. of Sen. Kyl) ("Subsections (a) and (b) of section [ ] 315 . . . impose time limits and other restrictions when inter partes . . . review are sought in relation to litigation . . . . [S]ubsections (a) do not restrict the rights of an accused infringer who has been sued . . . . That situation is governed by section 315(b), which provides that if a party has been sued for infringement and wants to seek inter partes review, he must do so within 6 months of when he was served with the infringement complaint."). Thus, providing notice to an accused infringer was paramount, and supports the concise language prescribed in Section 315(b).

In addition, Section 315(b) was enacted to prevent harassment of patent owners. "The *inter partes* proceeding . . . has been carefully written to balance the

need to encourage its use while at the same time preventing the serial harassment of patent holders." Meeting of H. Comm. on the Judiciary, Transcript of Markup of H.R. 1249, p. 72 (April 14, 2011) (statement of Judiciary Comm. Chair. Lamar Smith). This time bar ensures that *inter partes* review is not used as a "tool[]for harassment" by "repeated litigation and administrative attacks." H.R. Rep. No. 112-98, at 48 (2011) (Conf. Rep.). Thus, the legislative history balances the need to provide notice to a defendant so they can fully analyze patent claims with a limited period to exercise the right to petition for IPR. *See Motorola Mobility LLC v. Arnouse*, IPR2013-0010, slip. op. at 4-5 (PTAB Jan. 30, 2013) (Paper 20).

This legislative history supports the plain meaning of Section 315(b). An important goal of drafting Section 315(b) was to provide notice to the accused infringer of the claims alleged against them, and a limited opportunity to petition for IPR to prevent serial harassment of patent owners. Based on these precise goals, Section 315(b) included specific language that tied the triggering event to service of the complaint. Thus, notice of the alleged infringement was clear Congressional interest, and utilizing the term "served with a complaint alleging infringement of the patent" was calculated to support this goal. The Board's use of a legal fiction to nullify the notice function also nullified Congress' goal of instituting notice of alleged infringement as the trigger for the one-year bar to seeking *inter partes* review.

The Board's interpretation also conflicts with Congress' goal of preventing serial harassment. It is indisputable that this Petition for *inter partes* review was filed more than one year after Ingenio was first served with a complaint for infringement of the '836 Patent on June 8, 2001. (A301-302). Ingenio has since challenged the '836 Patent three separate times over the past 12 years—first in the 2001 suit, (A136-145), second when Ingenio requested and was granted *ex parte* reexamination of the '836 Patent in 2004, (A192-277, A087-89), and third in the pending civil action.[3] This *inter partes* review provides Ingenio a fourth attack on the '836 Patent—all four of these attacks occurred after Ingenio was first served with a complaint alleging infringement. This is precisely the type of serial harassment for which Congress expressly aimed to prevent. Thus, the Board's interpretation of Section 315(b) conflicts with all facets of the Congressional intent.

The text of Section 315(b), the statutory structure, and the legislative history all support the conclusive scope of the statute. The text, "served with a complaint alleging infringement of the patent" pertains to the act of receiving notice at the outset of litigation through official delivery of a complaint in a civil action. The emphasis on notice is further supported by a comparison to Section 315(a), which

---

[3] *Click to Call Technologies LP v. AT&T, Inc.*; *YP Holdings LLC*; *Ingenio, Inc.*; *Yellowpages.Com LLC*; *Ether, a division Ingenio, Inc.*; *and Ingenio, Inc., doing business as Keen*, Civil Action No.1: 12-cv-00465-SS, filed on May 29, 2012.

also pertains to the onset of litigation, but is broader as it refers to "filing a civil action." Finally, the legislative history supports the importance of providing notice to the accused infringer, and the statutory language was precisely crafted to accomplish that goal. Each of these tools of statutory interpretation indicate that Section 315(b) is clear, and the plain meaning is conclusive of its scope. Section 315(b) is triggered once the party receives notice through official delivery of a complaint in a civil action. Because the language of the statute is clear and its meaning unambiguous, the inquiry ends there.

### 3.    The Board is not entitled to *Chevron* deference because Section 315(b)'s plain meaning controls.

As shown above, the text of Section 315(b) is unambiguous and clearly outlines Congress' intent. The statutory text, the statutory framework, and the legislative history support Congress' intent to trigger the Section 315(b) period once the party receives notice through official delivery of a complaint in a civil action. This Court need not extend its analysis past *Chevron's* first step, and it need not afford the Board any deference. Nonetheless, if this court does analyze *Chevron's* second step, it is apparent that the Board's decision to extend its analysis to the subsequent effects of a Rule 41(a)(1) dismissal was not reasonable because it failed to account for the notice function of serving a complaint, which was a primary basis for Congress' enactment of Section 315(b). As shown below, even if this court extends its analysis to step two, it is clear that the Board's

rationale is unreasonable in light of the Congressional intent. Therefore, the Board is not entitled to *Chevron* deference.

### 4.    The Board's Interpretation of Section 315(b) is Unreasonable Because It Does Not Account for Petitioner's Actual Notice.

Despite the fact that the statute is unambiguous, the Board unreasonably interpreted Section 315(b) by relying on subsequent effect of a Fed. R. Civ. P. 41(a)(1) dismissal without prejudice. The Board held that a dismissal without prejudice is treated as if the action "never existed" and as a result the underlying complaint is treated as if it "had never been served." (Add. 12-13; A012-13). The primary error in this application is that it focuses on the subsequent legal effect of filing of a civil action as it pertains to statutes of limitation, and not the notice function expressed by Section 315(b) and its Congressional support. The legal fiction that renders a "nullity" of the proceedings cannot nullify the actual notice received by the dismissed defendant of its potential infringement and its right to seek review of the validity of the patent, as YP Interactive in fact did when it requested reexamination and subjected the '836 Patent to a grueling four and a half year review. (A192-277).

The authority relied upon by the Board does not resolve this issue, as it relates to dismissals of appeals that ultimately triggered denials of jurisdiction based on statutes of limitation, not on the service of an actual notice of infringement. Further, when a district court action is voluntarily dismissed without

prejudice, the court still retains jurisdiction over the matter and a plethora of statutes continue to apply, demonstrating the limitations of this legal fiction. Because the Board's application of this distinct rule fails to account for the actual notice of patent infringement received by the defendant through *service* of a complaint, its rejection of the application of the statutory bar in Section 315(b) is unreasonable and, therefore, not entitled to deference.

<strong><em>a.   Voluntary dismissals cannot erase the fact that the defendant received actual notice of the infringement claims through service of the complaint.</em></strong>

The primary purpose of service of a summons is to provide notice to the defendant that it has been sued. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). This notice is based on facts of the case and their legal effect. The Board's analysis attempts to put the parties in the same "legal position," but does not account for the fact that YP Interactive did in fact receive notice of the infringement claims against it when it was served with the complaint. *See Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1079 (7th Cir. 1987) ("Suppose the plaintiff files a suit, seeks a TRO, in the midst of the hearing asks to approach the bench, emits a Bronx cheer, punches the judge in the

nose, and as the judge reaches for a handkerchief to stanch the bleeding tenders a dismissal under Rule 41(a)(1)(i). In reply to the inevitable citation for contempt of court, the plaintiff could not say: 'I wasn't there in the eye (nose?) of the law; nothing happened for which I am responsible; for 'it is as if the suit had never been brought.'"). Thus, while the parties' tentative legal relationship is altered with respect to the underlying statute of limitations, this theory cannot erase the fact that the defendant was served and received actual notice of the infringement claims against it, which is the purpose of 315(b).

> b.  *The Board erroneously relied on Federal Circuit authority governing the dismissal of an appeal that was time-barred.*

The Board's reliance upon two of this Court's decisions, *Graves* and *Bonneville*, is misplaced. In both cases, the appellant voluntarily dismissed his appeal after obtaining a decision on the merits, and during the available period for filing an appeal. *See Graves v. Principi*, 294 F.3d 1350, 1355-56 (Fed. Cir. 2002) (Court of Veterans Appeals); *Bonneville Associates, LP v. Barram*, 165 F.3d 1360, 1362-65 (Fed. Cir. 1999) (Board of Contract Appeals). The issue before the Federal Circuit was whether the appellate court retained jurisdiction after the appellant voluntarily dismissed the appeal so as to toll the deadline for filing an appeal. *See Graves*, 294 F.3d at 1356; *Bonneville*, 165 F.3d at 1363-65. This Court concluded in each matter that once the appeal was dismissed, it was as if the appeal

had never been filed, and the court no longer had jurisdiction because the statute of limitations had run. *Id.*

The Board relied on *Graves*, *Bonneville*, and Wright & Miller for the notion that dismissal of an action without prejudice leaves the parties as though the action "had never been brought." *See Graves*, 294 F.3d at 1356; *see also Boneville*, 165 F.3d at 1365 ("The rule merely states the consequence of a voluntary dismissal without prejudice, namely, that the appellant cannot thereafter resurrect the appeal after the statute of limitations on the cause of action has run."). In the context of those cases, this legal fiction was true—whether the earlier case "had never been brought" or brought and dismissed made no difference, the limitations period from the underlying action would still have run because the legal fiction did not negate the triggering event for the statute of limitations, just as it does not here.

In the context of § 315(b), this legal fiction does not negate the effect of the triggering notice of infringement in a served complaint. Congress used the term "served with a complaint" to provide a trigger for the limitations period. The dismissal of the underlying filed action does not negate the notice that the service of the complaint provided to Ingenio. To hold otherwise, would be akin to the *Bonneville* court holding that the dismissal of the appeal nullified the final decision that triggered the 90-day limitations period or the *Graves'* court holding that the dismissal of the appeal nullified the decision that started the 120-day period in

which to appeal. In accordance with these cases, the only relevant consequence of the dismissal of the InfoRocket complaint is that it did not toll the one-year limitations period under Section 315(b), as demonstrated in both *Graves* and *Bonneville.*

The Board's reliance on *Graves* and *Bonneville* to interpret the effects of a voluntary dismissal in this context turns these cases on their heads. In each of these cases, the court denied jurisdiction because voluntarily dismissing the case without prejudice did not toll the statute of limitations. Here, the Board granted jurisdiction by effectively tolling the limitation because the underlying case was voluntarily dismissed without prejudice, contrary to the authority upon which it purports to rely. This interpretation distorts the application of Section 315(b) and its congressional intent. Consequently, the Board's application of this legal fiction was unreasonable.

        c.     *After a case is voluntarily dismissed under Rule 41(a) in district court, the court retains jurisdiction to issue binding decisions based on the parties' actions during the case.*

In a district court case, when a plaintiff dismisses the case under Rule 41(a)(1), it does not completely deprive the court of jurisdiction over the action or to rule on the parties' actions during the case. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 394-98 (1990). Labeling the action as a "nullity" or as "if it never happened" does not tell the whole story, as there are situations that allow the court

to make determinations regarding facts "that happened" in the court's jurisdiction. As a result, the application of this theory should be limited to the legal or factual framework at issue and not a complete evisceration of the existence of any fact in the action.

As the Supreme Court has stated, "[i]t is well established that a federal court may consider collateral issues after an action is no longer pending." *Id.* at 395. For example, a plaintiff's voluntary dismissal under Rule 41(a)(1) does not divest a district court of jurisdiction to, for example, consider a defendant's Rule 11 motion for conduct that took place prior to the dismissal, *id.* at 398, retain jurisdiction over the parties' settlement if provided for in the stipulation, *Schaefer Fan Co., Inc. v. J&D Mfg.*, 265 F.3d 1282, 1286-87 (Fed. Cir. 2001), award attorney fees, *Szabo Food*, 823 F.2d at 1077-79 (analyzing the limits of treating a Rule 41(a)(1) dismissal as if the case had never been brought and holding that courts can award fees under Rule 11 and issue sanctions for contempt), award costs, *Sequa Corp. v. Cooper*, 245 F.3d 1036, 1037-38 (8th Cir. 2001), grant relief from a judgment under Rule 60(b), *see Nelson v. Napolitano*, 657 F.3d 586, 589 (7th Cir. 2011), or allow recovery of a security under Rule 65(c), *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 134-35 (2d Cir. 2014).

These cases demonstrate the various ways a court retains its jurisdiction to issue binding decisions based on factual events in the case, despite the voluntary

dismissal without prejudice and nullification of the action under a Rule 41(a)(1) dismissal. Notwithstanding this precedent, the Board determined it was not required to issue a decision that the statute of limitation in Section 315(b) barred the IPR based on Ingenio's actual receipt of service of the complaint because, in its view, nullification of the action under the Rule 41(a)(1) dismissal also nullified the underlying fact the complaint had been served. No court has held that a voluntary dismissal has the effect of nullifying the notice received by service of a complaint, so this theory should not apply here. Notwithstanding, the Board extended this theory by nullifying the notice received through service, despite Ingenio actually receiving notice of the claims against it by being served with a complaint alleging infringement of the '836 Patent, which is exactly what the plain meaning of Section 315(b) requires. The Board's extension of this theory was unreasonable.

### 5.    Under the Proper Interpretation of Section 315(b), the Board Lacked Jurisdiction.

Because Ingenio (now known as YP Interactive LLC) was served with a complaint alleging infringement of the '836 more than one year prior to the filing of the Petition, Petitioner is barred from obtaining *inter partes* review. In addition, Petitioner lacked standing pursuant to 37 C.F.R. § 42.101(b) to request *inter partes* review of the '836 Patent for the same reasons. (A299 n.5). Because the Petition should have been time-barred under Section 315(b), the Board lacked jurisdiction to issue its final written decision under 37 C.F.R. § 42.3. Therefore, the final

32

written decision should be vacated because the Board exceeded its jurisdictional authority.

## VI.    CONCLUSION

For the foregoing reasons, Click-to-Call respectfully requests that this Court vacate the Board's final written decision because it did not have jurisdiction or authority to make its final decision. Petitioner YP Interactive was served with a complaint alleging infringement of the '836 Patent more than one year before the Petition was filed, and therefore, the IPR was barred as clearly prescribed by the plain meaning of 35 U.S.C. § 315(b). Therefore, any action taken by the Board as a result of this error is in contravention of its jurisdictional authority.

Dated: March 9, 2015.

Respectfully submitted,

By: /s/ Peter J. Ayers
Peter J. Ayers
LEE & HAYES, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Phone: (512) 605-0252
Fax: (512) 605-0252
peter@leehayes.com

Reid Johnson
LEE & HAYES, PLLC
601 W. Riverside Ave., Suite 1400
Spokane, Washington 99201
Phone: (509) 944-4637
Fax: (509) 323-8979
rjohnson@leehayes.com

*ATTORNEYS FOR APPELLANT*
*CLICK-TO-CALL TECHNOLOGIES LP*

# **ADDENDUM**

# <u>TABLE OF CONTENTS</u>

<u>**Addendum Page**</u>

Final Written Decision of the
Patent Trial and Appeal Board
(35 U.S.C. § 318(a) and 37 C.F.R. § 42.73)
   filed October 28, 2014 ...................................................................................1

Trials@uspto.gov                                              Paper 52
571-272-7822                              Entered: October 28, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

ORACLE CORPORATION,
ORACLE OTC SUBSIDIARY LLC,
YP INTERACTIVE LLC, and
YELLOWPAGES.COM LLC,
Petitioners,

v.

CLICK-TO-CALL TECHNOLOGIES LP,
Patent Owner.
_____

Case IPR2013-00312
Patent 5,818,836
_____

Before MICHAEL R. ZECHER, THOMAS L. GIANNETTI, and
TRENTON A. WARD, *Administrative Patent Judges*.

ZECHER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00312
Patent 5,818,836

## I. BACKGROUND

Oracle Corporation, Oracle OTC Subsidiary LLC, YP Interactive LLC,[1] and Yellowpages.com LLC (collectively, "Oracle") filed a Petition requesting an *inter partes* review of claims 1, 2, 8, 12, 13, 15, 16, 18, 19, 22–24, and 26–30 of U.S. Patent No. 5,818,836 (Ex. 1001, "the '836 patent"). Paper 1 ("Pet."). Click-to-Call Technologies LP ("CTC") timely filed a Preliminary Response. Paper 14 ("Prelim. Resp."). Taking into account the information presented in Oracle's Petition, as well as the arguments presented in CTC's Preliminary Response, the Board determined that the information presented in the Petition demonstrated only that there was a reasonable likelihood that Oracle would prevail in challenging claims 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 as unpatentable under 35 U.S.C. §§ 102(e) and 103(a). Pursuant to 35 U.S.C. § 314, the Board instituted this proceeding on October 30, 2013, only as to these claims of the '836 patent. Paper 26 ("Dec.").

During this proceeding, CTC timely filed a Patent Owner Response (Paper 41, "PO Resp."), and Oracle timely filed a Reply to the Patent Owner Response (Paper 43, "Pet. Reply"). An oral hearing was held on June 26, 2014. Paper 51 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This decision is a final written decision under 35 U.S.C. § 318(a) as to the patentability of claims 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 of the '836 patent. For the

---

[1] During trial, Petitioners filed an updated mandatory notice indicating that Ingenio LLC, one of the original Petitioners in this proceeding, changed its name to YP Interactive LLC. Paper 49, 1; Ex. 1026.

2

reasons discussed below, Oracle has demonstrated by a preponderance of the
evidence that these claims are unpatentable.

### A. The '836 Patent

The '836 patent generally relates to a method and system for
establishing anonymous telephone communications. Ex. 1001, 1:8–9.
Figure 1 of the '836 patent, reproduced below, illustrates an anonymous
voice communication system. *Id*. at 4:35, 54–56.



FIG. 1

As shown in Figure 1 of the '836 patent, anonymous voice communication
system 10 uses circuit switched network ("CSN") 12 and anonymous voice
system ("AVS") 14 to establish an anonymous voice communication
between party A and party B. Ex. 1001, 4:56–59. In another embodiment,
system 10 uses packet switched network ("PSN") 16 and on-line data system
("ODS") 18 to initiate an anonymous voice communication between party A
and party B. *Id*. at 4:59–63.

The '836 patent discloses that each party has telephone station 20 or
22 associated therewith that is connected to CSN 12. Ex. 1001, 4:64–65.

IPR2013-00312
Patent 5,818,836

Telephone stations 20 and 22 may be ordinary telephones, integrated services digital network telephones, or any device that can terminate an access line, play an audio signal, and transmit a received audio signal. *Id*. at 5:24–27. System 10 uses CSN 12 to establish a voice connection between telephone stations 20 and 22, as well as AVS 14. *Id*. at 4:65–67.

The '836 patent further discloses that each party has data terminal 24 or 26 associated therewith that is connected to ODS 18 via CDS 12 and PSN 16. Ex. 1001, 5:5–8. Data terminals 24 and 26 may be a personal computer with the ability to process and store data, display information, accept input via a keyboard, microphone, or writing tablet, and communicate with other devices via a serial port, modem, or local area network. *Id*. at 5:28–32. Each party may use its respective data terminals 24 or 26 to exchange messages through ODS 18 to request an anonymous voice connection, which, in turn, causes ODS 18 to generate a command that prompts AVS 14 to establish a telephone connection between the parties. *Id*. at 5:8–13.

The '836 patent discloses at least three different methods of creating an anonymous voice communication using system 10 illustrated in Figure 1: (1) standalone; (2) on-line; and (3) single party initiated. Ex. 1001, 9:45–47. With respect to the on-line method of establishing an anonymous voice communication, the parties initiate an anonymous voice call using ODS 18. *Id*. at 16:54–55. Each party may use its data terminal 24 or 26 to log on to ODS 18. *Id*. at 16:55–57. The parties may contact each other via ODS 18 using public chat, private chat, electronic mail, or newsgroups. Ex. 1001, 16:57–59. The parties can communicate via ODS 18 without revealing their identity to each other, i.e., they are identified by screen names, handles, or

4

IPR2013-00312
Patent 5,818,836

subscriber identifications, which only the operator of ODS 18 can translate into the subscriber's identification. *Id*. at 16:59–64. According to the '836 patent, either party A or party B may initiate an anonymous voice communication using the on-line method. *Id*. at 16:65.

## B.  Illustrative Claim

Of the challenged claims, claims 1 and 12 are independent claims. Claims 2, 8, 22, 23, and 26 directly or indirectly depend from independent claim 1, and claims 13, 15, 16, 19, 29, and 30 directly or indirectly depend from independent claim 12. Independent claim 1 is illustrative of the '836 patent and is reproduced below:

> 1.    A method for creating a voice connection over a circuit switched network between a first party and a second party using an on-line data service to initiate the connection, comprising the steps of:
>
> a)    establishing an electronic communication between the first party and the second party through the on-line data service between the first party and the second party, wherein the first party is anonymous to the second party prior to establishing a first electronic communication between the first party and the second party, wherein the establishing includes providing over the Internet, to a data terminal of the first party coupled to the Internet, information publicly accessible over the Internet, wherein the information publically accessible over the Internet is suitable for presentation within a graphical user interface of the data terminal of the first party, wherein the information publicly accessible over the Internet includes:
>
> (1)    first information characterizing a second party,
>
> (2)    second information representing a communication from the second party, and
>
> (3)    third information specifying a user-selectable element for display within the graphical user interface of the data terminal of the first party, wherein the user-selectable element is visually associated, within the graphical

5

IPR2013-00312
Patent 5,818,836

> user interface of the data terminal of the first party, with the
> first information and the second information, when the first
> information, second information and user-selectable element
> are presented within the graphical user interface of the data
> terminal of the first party; and
>
> > (b)     following the establishment of an electronic
> > communication between the first party and the second party
> > through the on-line data service between the first party and the
> > second party, and in response to receiving an indication of
> > selection of the user-selectable element displayed within the
> > graphical user interface of the data terminal of the first party,
> > performing the steps of:
> >
> > > (1)     requesting a voice communication between
> > > the first party and the second party through the on-line data
> > > service;
> > >
> > > (2)     transmitting a message from the on-line data
> > > service to a voice system requesting the voice connection
> > > between said first party and said second party;
> > >
> > > (3)     establishing a first telephone call for the first
> > > party;
> > >
> > > (4)     establishing a second telephone call for the
> > > second party; and
> > >
> > > (5)     connecting said first telephone call with said
> > > second telephone call.

Ex. 2001[2], 1:26–2:8 (brackets and emphases omitted).

### C. Related Proceedings

Both parties indicate that the '836 patent was asserted in the following

civil actions, each of which was filed in the United States District Court for

the Western District of Texas: (1) *Click to Call Technologies LP v. Oracle*

*Corporation*, No. 1:12-cv-00468-SS, filed on May 29, 2012; (2) *Click to*

*Call Technologies LP v. eHarmony, Inc.*, No. 1:12-cv-00469-SS, filed on

---

[2] This citation is to Ex Parte Reexamination Certificate No. US 5,818,836
C1, which issued on December 30, 2008.

IPR2013-00312
Patent 5,818,836

May 30, 2012; and (3) *Click to Call Technologies LP v. AT&T, Inc.*, No.

1:12-cv-00465-SS, filed on May 29, 2012.  Pet. 1–2; Paper 7, 2–3.

### D. Prior Art Relied Upon

Oracle relies upon the following prior art references:

Dezonno          US 5,991,394          Nov. 23, 1999          Ex. 1002
                                   (effectively filed Apr. 21, 1995)

DALE DOUGHERTY & RICHARD KOMAN, THE MOSAIC HANDBOOK
FOR MICROSOFT WINDOWS 17–39 (1994) (Ex. 1004) ("Mosaic
Handbook").

### E. Instituted Grounds of Unpatentability

We instituted this proceeding based on the asserted grounds of

unpatentability set forth in the table below.

IPR2013-00312
Patent 5,818,836

| Challenged Claims | Basis | Reference(s)[3] |
|---|---|---|
| 1, 2, 12, 13, 19, 22, 23, 26, 29, and 30 | § 102(e) | Dezonno |
| 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 | § 103(a) | Dezonno |
| 22 and 29 | § 103(a) | Dezonno and Mosaic Handbook |

II. ANALYSIS

*A. Claim Construction*

In an *inter partes* review, we construe a claim by applying the broadest reasonable interpretation in light of the specification of the patent in which it appears. 37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

*1. Claim Terms or Phrases Construed by Oracle*

In its Petition, Oracle provides claim constructions for a number of claim terms or phrases recited in the '836 patent. Pet. 8–11 (citing Ex. 1009; Ex. 1010). CTC does not propose alternative claim constructions for these

---

[3] For the grounds of unpatentability based solely on Dezonno, although Oracle includes dependent claims 18 and 24 in the statement of the grounds of unpatentability (Pet. 21), Oracle nonetheless does not include dependent claims 18 and 24 in the corresponding analysis (*see id*. at 21–31). Conversely, although Oracle omits dependent claims 22 and 29 in the statement of the grounds of unpatentability (*id*. at 21), Oracle nonetheless includes dependent claims 22 and 29 in the corresponding analysis (*id*. at 29, 31). We will treat the incorrect statement of the grounds of unpatentability as a typographical error and presume Oracle intended to assert that claims 1, 2, 12, 13, 19, 22, 23, 26, 29, and 30 are anticipated under 35 U.S.C. § 102(e) by Dezonno, whereas claims 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 are unpatentable under 35 U.S.C. § 103(a) over Dezonno.

IPR2013-00312
Patent 5,818,836

claim terms or phrases in either its Preliminary Response or Patent Owner

Response.  We adopted the claim constructions proposed by Oracle in our

Decision to Institute (Dec. 10–13) and we discern no reason to alter those

claim constructions for this Final Written Decision.  For convenience, the

claims constructions proposed by Oracle are reproduced in the table below.

| Claim(s) | Claim Term or Phrase | Claim Construction |
|---|---|---|
| 1 and 12 | "party" | A person or group participating in an action. |
| 1 and 12 | "anonymous" | Identity is not revealed. |
| 1 and 12 | "voice system" | A system that can connect voice calls. |
| 1 and 12 | "data terminal" | A computing device capable of sending and/or receiving data. |
| 1 | "on-line data service" | A service provided by an on-line data system, such as electronic mail, chat, newsgroups, or access to information. |
| 12 | "on-line data system" | A computing device or distributed computing system with storage and communications capability that provides services on-line, such as electronic mail, chat, newsgroups, or access to information. |
| 1 and 12 | "information publicly accessible" | Information that is widely available and subject to minimal constraints, such as subscription, registration, or ability to access the on-line data service or system. |

9

IPR2013-00312
Patent 5,818,836

| Claim(s) | Claim Term or Phrase | Claim Construction |
|---|---|---|
| 1 | "establishing [or establishment of] an electronic communication between the first party and the second party" | Transferring information electronically from one party to another party. |
| 1 and 12 | "second information representing a communication from the second party" | Information representing information transferred from the second party. |
| 1 | "requesting a voice communication between the first party and the second party through the on-line data service" | Requesting a voice communication using the on-line data service. |
| 12 | "connect command" | A command that directs the voice system to connect a first telephone call with a second telephone call. |
| 1 and 12 | "indication [or indicative] of selection of the user-selectable element" | Information indicating that the user-selectable element was selected. |
| 12 | "on-line data system that is coupled to the data terminal of each party" | A computing device or distributed computing system with storage and communications capability that provides services on-line, such as electronic mail, chat, newsgroup, or access to information, and is coupled to the data terminal of each party. |

10

IPR2013-00312
Patent 5,818,836

| Claim(s) | Claim Term or Phrase | Claim Construction |
|---|---|---|
| 1 | "on-line data service between the first and the second party" | A service provided by an on-line data system, such as electronic mail, chat, newsgroup, or access to information. |

2. *"First Information" and "Second Information"  (Claims 1 and 12)*

In its Petition, Oracle contends that the claim terms "first information" and "second information" recited in independent claims 1 and 12 are not entitled to patentable weight because each claim term amounts to non-functional descriptive material that has no functional relationship to any substrate or other portions of the claims. Pet. 60. In its Preliminary Response, CTC contends that the "first information" and "second information" recited in independent claim 1 are entitled to patentable weight because they have a direct functional relationship to the claimed "establishing" step (a), as well as the claimed "performing" steps (b)(1)–(5). Prelim. Resp. 21–23. Similarly, CTC contends that "first information" and "second information" recited in independent claim 12 are entitled to patentable weight because they have a direct functional relationship to "the provision of the information publicly accessible," which is structured through the claimed visual association of a user-selectable element with the first and second information. *Id*. at 23.

In the Decision to Institute, we determined that, because the claim terms "first information" and the "second information" have a functional relationship with other claimed features recited in independent claims 1 and 12, these claim terms limit the claimed invention functionally and, as a result, are entitled to patentable weight. Dec. 13–14. During trial, neither

11

IPR2013-00312
Patent 5,818,836

Oracle nor CTC dispute our determination in that regard.  We discern no reason to alter our claim construction of these claim terms for this Final Written Decision.

### B. *YP Interactive LLC Is Not Barred Under 35 U.S.C § 315(b) From Pursuing an Inter Partes Review of the '836 Patent*

In the Decision to Institute, as well as a subsequent Decision on CTC's Request for Rehearing (Paper 40), we determined that one of the original Petitioners—namely, Ingenio LLC, which has since changed its name to YP Interactive LLC—is not barred from pursuing an *inter partes* review under 35 U.S.C. § 315(b).  Dec. 15–18; Paper 40, 3–5.  In its Patent Owner Response, CTC renews its argument that we erroneously interpreted § 315(b) because the legislative history associated with this statute dictates that the plain meaning of "served with a complaint alleging infringement of [a] patent" is conclusive and, therefore, our analysis of the issue in both the Decision to Institute and the Decision on CTC's Request for Rehearing erred in looking beyond the statutory language.  PO Resp. 53–56.  In its Reply, Oracle reiterates the position we took in both the Decision to Institute and the Decision on CTC's Request for Rehearing that there is no statutory bar against YP Interactive LLC because a voluntarily dismissal of a complaint without prejudice does not trigger a bar under § 315(b).  Pet. Reply 15.

As stated in the Decision to Institute and the Decision on CTC's Request for Rehearing, both the Federal Rules of Civil Procedure and Federal Circuit precedent treat a dismissal without prejudice as something that, *de jure*, never existed.  Dec. 16–17; Paper 40, 4.  It is undisputed that the patent infringement suit filed by Inforocket against Keen—now YP Interactive LLC—on June 8, 2001, was dismissed without prejudice on

12

IPR2013-00312
Patent 5,818,836

March 21, 2003.  Ex. 1019, 1; Ex. 1017, 4; Ex. 1018, 8.  We have determined that, because this patent infringement suit was dismissed without prejudice, Federal Circuit precedent interprets such a dismissal as leaving the parties in the same legal position as if the underlying complaint had never been served.  *See Graves v. Principi*, 294 F.3d 1350, 1356 (Fed. Cir. 2002); *Bonneville Assoc., Ltd. P'ship v. Baram*, 165 F.3d 1360, 1364 (Fed. Cir. 1999).  *Accord* 9 WRIGHT, MILLER, KANE, and MARCUS, FEDERAL PRAC. & PROC. CIV. § 2367 (3d. ed.).  As a consequence, YP Interactive LLC is not barred from pursuing an *inter partes* review of the '836 patent under § 315(b).

### C. Grounds of Unpatentability Based, in Whole or in Part, on Dezonno

In its Petition, Oracle presents the following grounds of unpatentability:  (1) claims 1, 2, 12, 13, 19, 22, 23, 26, 29, and 30 are anticipated under 35 U.S.C. § 102(e) by Dezonno; (2) claims 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 are unpatentable under 35 U.S.C. § 103(a) over Dezonno; and (3) claims 22 and 29 are unpatentable under 35 U.S.C. § 103(a) over the combination of Dezonno and Mosaic Handbook.  Pet. 15–33.  In support of these asserted grounds of unpatentability, Oracle relies upon claim charts to explain how Dezonno, either standing alone or in combination with Mosaic Handbook, discloses the claimed subject matter recited in each of these claims.  *Id.*  Oracle also presents the Declaration of Dr. Robert L. Stevenson (Ex. 1007 ¶¶ 11–17) to support its positions.  *Id.*

In its Patent Owner Response, CTC does not challenge the contentions and supporting evidence presented by Oracle in its Petition, but instead attempts to antedate Dezonno.  In particular, CTC contends that the invention embodied in these claims ("the claimed invention") was conceived

IPR2013-00312
Patent 5,818,836

prior to the earliest effective filing date of Dezonno—namely, April 21, 1995 (Ex. 1002, at [63]).  PO Resp. 1–2.  CTC further contends that the claimed invention was constructively reduced to practice on August 9, 1995, the filing date of the patent application that led to the '836 patent, as well as actually reduced to practice on August 15, 1995, the day before the ONE BBSCON conference.  *Id*. at 2–3. According to CTC, the ONE BBSCON conference was a major industry conference where Mr. Stephen C. DuVal, the named inventor of the '836 patent (Ex. 1001, at [76]), planned to announce his purported invention.  PO Resp. 1.  In addition, CTC asserts that Mr. DuVal continually exercised reasonable diligence from April 20, 1995, through August 9, 1995 ("the critical period").  *Id*. at 5–8.  As a consequence, CTC argues that Dezonno does not qualify as prior art under 35 U.S.C. § 102(e).  *Id*. at 8

We begin our analysis with the principles of law that generally apply to antedating a reference, followed by a brief discussion of the parties contentions regarding conception, and then we turn to the parties contentions regarding whether there is sufficient evidence on this record to provide independent corroboration of Mr. DuVal's testimony that he continually exercised reasonable diligence during the entire critical period.

### *1. Principles of Law*

An inventor may antedate a reference if he was the first to conceive of a patentable invention, and then connects the conception of his invention with its reduction to practice by reasonable diligence on his part, such that conception and diligence are substantially one continuous act.  *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996).  An inventor's testimony, standing alone, is insufficient to prove conception and diligence,

14

IPR2013-00312
Patent 5,818,836

as some form of corroboration is required. *Mahurkar*, 79 F.3d at 1577; *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993). A rule of reason applies to determine whether the inventor's testimony has been corroborated. *Price*, 988 F.2d at 1194.

During the period in which reasonable diligence must be shown, there must be continuous exercise of reasonable diligence. *In re McIntosh*, 230 F.2d 615, 619 (CCPA 1956); *see also Burns v. Curtis*, 172 F.2d 588, 591 (CCPA 1949) (referring to "reasonably continuous activity"). A party alleging diligence must account for the entire critical period. *Griffith v. Kanamuru*, 816 F.2d 624, 626 (Fed. Cir. 1987); *Gould v. Schawlow*, 363 F.2d 908, 919 (CCPA 1966). Even a short period of unexplained inactivity is sufficient to defeat a claim of diligence. *Morway v. Bondi*, 203 F.2d 742, 749 (CCPA 1953); *Ireland v. Smith*, 97 F.2d 95, 99–100 (CCPA 1938). In *In re Mulder*, 716 F.2d 1542, 1542–46 (Fed. Cir. 1983), for example, the Federal Circuit affirmed a determination of lack of reasonable diligence, where the evidence of record was lacking for a two-day critical period. Likewise, in *Rieser v. Williams*, 255 F.2d 419, 424 (CCPA 1958), there was no showing of diligence where no activity was shown during the first thirteen days of the critical period.

A party alleging diligence must provide corroboration with evidence that is specific both as to facts and dates. *Gould*, 363 F.2d at 920; *Kendall v. Searles*, 173 F.2d 986, 993 (CCPA 1949). The rule of reason does not dispense with the need for corroboration of diligence that is specific as to dates and facts. *Gould*, 363 F.2d at 920; *Kendall*, 173 F.2d at 993; *see also Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985) ("The rule of

15

IPR2013-00312
Patent 5,818,836

reason . . . does not dispense with the requirement for some evidence of independent corroboration.").

### 2. Conception

In its Patent Owner Response, CTC contends that the following documents collectively demonstrate that Mr. DuVal conceived of the claimed invention of the '836 patent before the earliest effective filing date of Dezonno—namely, April 21, 1995: (1) the October 1994 invention disclosure document filed with the Office (Ex. 2017, Attachment A); (2) the February 1995 PrivTel[4] Business Plan produced by Mr. DuVal at the request of Mr. Brian Forrest (Ex. 2017, Attachment C); (3) the March 1995 invention disclosure document filed with the Office (Ex. 2017, Attachment B); and (4) the March 1995 letter Mr. DuVal sent to the law firm of Blakely, Sokoloff, Taylor, and Zafman LLP instructing them to prepare and file a patent application (Ex. 2017, Attachment O). PO Resp. 10–36. CTC further contends that these documents independently corroborate Mr. DuVal's testimony that he conceived of the claimed invention of the '836 patent prior to April 21, 1995. *Id.*

In its Reply, Oracle contends that CTC has not established that Mr. DuVal conceived of the claimed invention of the '836 patent before April 21, 1995, because CTC does not demonstrate that distributing client software over the Internet, as required by independent claims 1 and 12, was either inherent or obvious in light of the March 1995 invention disclosure document. Pet. Reply 14. Oracle further argues that independent claims 1

---

[4] Mr. DuVal testifies that he formed PrivTel on December 12, 1994, to demonstrate, produce, commercialize, and sell his claimed inventions. Ex. 2017 ¶ 7(C).

IPR2013-00312
Patent 5,818,836

and 12 both require that the claimed user-selectable element, first information, and second information must be displayed at the same time. *Id.* at 15. Oracle asserts that, because the claimed user-selectable element is part of the client software, it is displayed when the software begins to run, i.e., before display of the claimed second information. *Id.*

Even if we were to agree with CTC that there is sufficient evidence to corroborate Mr. DuVal's testimony that he conceived of the claimed invention of the '836 patent prior to April 21, 1995, as we will discuss below, CTC does not provide sufficient evidence to corroborate Mr. DuVal's testimony that there was a continuous exercise of reasonable diligence during the entire critical period. Consequently, we need not reach and, therefore, do not address conception.

*3. Diligence*

To demonstrate diligence during the entire critical period, CTC relies upon the declarations of the following individuals: (1) Mr. DuVal (Ex. 2017); (2) Mr. Forrest (Ex. 2019); (3) Mr. Ben Yorks (Ex. 2021), a former partner at Blakely, Sokoloff, Taylor, and Zafman LLP who was hired by Mr. DuVal to draft and file the patent application that led to the '836 patent; (4) Mr. Bob Shinn (Ex. 2022), the former president and owner of SofTel, Inc. ("SofTel"); (5) Mr. Simon Clement (Ex. 2023), the former president of ProDesign, Inc. ("ProDesign"); and (6) Mr. Doug Martin (Ex. 2025), the former Chief Technology Officer and co-owner of Interactive Communication Services ("ICS"). PO Resp. 36–48. Of particular importance is the testimony of Mr. Yorks regarding his preparation in drafting and filing the patent application that led to the '836 patent, as well as the testimony of Mr. Shinn, Mr. Clement, and Mr. Martin,

17

IPR2013-00312
Patent 5,818,836

each of whom represents one of the three software developers—namely, SofTel, ProDesign, and ICS—hired by Mr. DuVal to implement the claimed invention.  *Id*. at 39–40.  In its Reply, Oracle contends that CTC does not provide sufficient evidence to corroborate Mr. DuVal's testimony that he was reasonably diligent during the entire critical period with respect to both constructively reducing the claimed invention to practice and actually reducing the claimed invention to practice.  Pet. Reply. 5–13.

In our analysis below, we will explain how the aforementioned supporting evidence, taken as a whole, does not support CTC's contention that there was a continuous exercise of reasonable diligence during the entire critical period.  In particular, we will address how this evidence does not demonstrate that Mr. DuVal was diligent with respect to constructive reduction to practice, and then turn to how this evidence does not demonstrate that he was diligent with respect to actual reduction to practice.

### a. CTC Does Not Demonstrate a Continuous Exercise of Reasonable Diligence With Respect to Constructive Reduction to Practice

As we explained previously, Mr. DuVal constructively reduced the claimed invention to practice when he filed the patent application that led to the '836 patent on August 9, 1995.  The earliest effective filing date of Dezonno is April 21, 1995.  Ex. 1002, at [63].  To show diligence with respect to constructive reduction to practice during the entire critical period, CTC primarily relies upon the testimony of Mr. DuVal and Mr. Yorks.

Mr. DuVal testifies that, after Mr. Yorks prepared an initial draft of the patent application that led to the '836 patent just prior to April 21, 1995, until at least May 2, 1995, he personally reviewed and revised the initial draft between May 2, 1995, and May 9, 1995.  Ex. 2017 ¶ 8(D)(1)–(2); *see*

*also* Ex. 2024 ¶ 7 (William W. Schaal, a current partner at Blakely,
Sokoloff, Taylor, and Zafman LLP, testifies that, at the direction of Mr.
DuVal, he obtained an advisor letter and a draft patent application that was
sent from his law firm to Mr. DuVal on May 2, 1995.).  Mr. DuVal then
testifies that "[f]rom at least May 9, 1995 until July 17, 1995, Mr. Yorks and
I continued to make progress on the preparation of my patent application."
Ex. 2017 ¶ 8(D)(3).  Mr. Yorks's testimony regarding the preparation and
review of the initial draft of the patent application that led to the '836 patent
is consistent with the timeline provided by Mr. DuVal.  *Compare* Ex. 2021
¶ 6 (H)–(J), *with* Ex. 2017 ¶ 8(D)(1)–(3) .

        The testimony offered by Mr. DuVal and Mr. Yorks concerning the
preparation and review of the draft patent application, however, is not
specific as to facts and dates for the entire critical period during which
diligence is required.  *See Gould*, 363 F.2d at 920; *Kendall*, 173 F.2d at 993.
Mr. DuVal and Mr. Yorks do not provide sufficient evidence to corroborate
the work actually performed on the draft patent application that led to the
'836 patent between May 9, 1995, and July 17, 1995.  Given the absence of
specific details concerning the work that was done on the draft patent
application, the testimony from Mr. DuVal and Mr. Yorks amounts to mere
pleadings and is insufficient to establish diligence with respect to
constructive reduction to practice during this time period.  *See In re Harry*,
333 F.2d 920, 923 (CCPA 1964) (Statements that are unsupported by
evidence or a showing of facts essentially amount to mere pleadings.).
Moreover, during oral argument, counsel for CTC conceded that, if we were
to focus exclusively on the activities either Mr. DuVal or Mr. Yorks engaged
in to constructively reduce the claimed invention to practice, that, by itself,

IPR2013-00312
Patent 5,818,836

would be insufficient to establish diligence during the entire critical period.
Tr. 35:17–36:9.

Based on the record before us, the testimony from Mr. DuVal and Mr. Yorks regarding constructive reduction to practice is not specific as to facts and dates for at least the time period between May 9, 1995, and July 17, 1995, and, as result, does not establish that Mr. DuVal was diligent during the entire critical period.

###### b. *CTC Does Not Demonstrate a Continuous Exercise of Reasonable Diligence With Respect to Actual Reduction to Practice*

As we explained previously, CTC contends that Mr. DuVal actually reduced the claimed invention to practice on August 15, 1995, the day before the ONE BBSCON conference was scheduled to begin in Tampa, Florida. The earliest effective filing date of Dezonno is April 21, 1995. Ex. 1002, at [63]. To show diligence during the entire critical period leading to this actual reduction to practice, CTC primarily relies upon the testimony of Mr. DuVal, as well as the testimony of Mr. Shinn, Mr. Clement, and Mr. Martin, regarding the work performed by the three software developers hired by Mr. DuVal to implement the claimed invention.

Mr. DuVal testifies that "[f]rom at least prior to April 21, 1995 until at least August 20, 1995, I was working full-time, approximately twelve hours a day, seven days a week, to execute on my company's business plan, and particularly to meet my Diligence Goals." Ex. 2017 ¶ 8(C). This testimony from Mr. DuVal regarding the work he performed to implement the claimed invention is not specific as to facts and dates for the entire critical period during which diligence is required. *See Gould*, 363 F.2d at 920; *Kendall*, 173 F.2d at 993. Once again, Mr. DuVal's statement amounts to a mere

20

IPR2013-00312
Patent 5,818,836

conclusion and lacks sufficient detail to establish diligence with respect to actual reduction to practice during the entire critical period.  *See Harry*, 333 F.2d at 923.

With respect to the three software developers hired by Mr. DuVal to implement the claimed invention, Mr. DuVal testifies that "[a]t a minimum, each . . . [of] ICS, SofTel and ProDesign, committed at least one full-time engineer to PrivTel's development efforts to complete a working prototype of [the claimed invention] . . . in time for [the] ONE BBSCON [conference] on August 16–20, 1995."  Ex. 2017 ¶ 8(F) (citing Ex. 2022 ¶¶ 11–18; Ex. 2023 ¶ 18; Ex. 2025 ¶ 10).  CTC, however, does not provide sufficient evidence to corroborate the testimony of Mr. DuVal regarding the work performed by the engineers employed by SofTel, ProDesign, and ICS to implement the claimed invention.

For instance, CTC does not provide test results, billing records, or other documentary evidence indicating that these engineers engaged in a continuous exercise of reasonable diligence during the entire critical period to implement the claimed invention.  Absent such corroborating evidence, we are left to speculate whether the work performed by these engineers took several weeks or just a couple of days to complete.  Even if we were to assume that the work took several weeks to complete, we cannot assess whether there are any diligence gaps during the critical period without sufficient evidence establishing what activities took place on particular dates.  Conversely, if we were to assume that the work performed by theses engineers only took a few days to complete, then there necessarily would be one or more large gaps in diligence during the critical period that are unaccounted for.  Put simply, without sufficient evidence to substantiate

21

IPR2013-00312
Patent 5,818,836

details of the worked performed by the engineers employed by SofTel, ProDesign, and ICS to implement the claimed invention, CTC has failed to corroborate Mr. DuVal's testimony that these engineers performed reasonably continuous activities to reduce the claimed invention to practice.

In its Patent Owner Response, CTC focuses on certain activities performed by each software developer to implement the claimed invention and the respective payments made by PrivTel to each software developer for their services.  PO Resp. 41–47.  The analysis that follows focuses on the activities of each software developer and the corresponding payments received from PrivTel, particularly during the time period between May 15, 1995, and June 15, 1995.

### i.  ICS

Mr. DuVal testifies that he worked with ICS to develop a software development services agreement to build the claimed invention, which, in turn, was executed on or around May 15, 1995. Ex. 2017 ¶ 8(J)(2). Mr. DuVal further testifies that PrivTel made an initial payment of $2,000 to ICS on May 15, 1995, after which ICS worked diligently to design the claimed invention, including the system architecture, communication protocols, and overall system design work.  Ex. 2017 ¶ 8(J)(3).  After ICS completed its design of the claimed invention, Mr. DuVal testified that PrivTel made another payment of $6,400 to ICS on July 1, 1995. *Id.* Mr. Martin's testimony regarding the design of the claimed invention by ICS and corresponding payments for its services is consistent with the timeline provided by Mr. DuVal.  *Compare* Ex. 2025 ¶ 10–15, *with* Ex. 2017 ¶ 8(J)(2)–(3).

IPR2013-00312
Patent 5,818,836

In its Reply, Oracle contends that neither Mr. DuVal nor Mr. Martin identify the tasks or activities performed by ICS on a particular date between May 15, 1995, and July 1, 1995, nor do they provide documentary evidence that provides such information.  Pet. Reply 9.  Oracle further argues that there is no evidence of record indicating that ICS actually created a design of the claimed invention during this period, nor that ProDesign and SofTel waited for, or even subsequently used, the design allegedly created by ICS. *Id*. at 11.

The testimony that CTC relies upon to explain the activities performed by ICS to implement the claimed invention is not specific as to facts and dates for the entire critical period during which diligence is required, particularly during the time period between May 15, 1995, and July 1, 1995.  First, Mr. DuVal does not indicate that he has personal knowledge about the work performed by ICS during this time period. Therefore, his testimony is entitled to little weight.  Second, Mr. Martin does not indicate whether it took ICS several weeks or just a few days to complete the design of the claimed invention.  Third, CTC does not provide evidence that the design of the claimed invention allegedly created by ICS during this time period actually exists.  Nor does CTC indicate that this alleged design was necessary for ProDesign and SofTel to complete the work they were hired to perform to implement the claimed invention.  *See e.g.*, Ex. 2023, Attachment A; Ex. 2022, Attachment C.  Absent underlying evidence to support the testimony from Mr. DuVal and Mr. Martin that ICS worked diligently to implement the claimed invention between May 15, 1995, and July 1, 1995, we are not persuaded that ICS performed reasonably

IPR2013-00312
Patent 5,818,836

continuous activities to reduce the claimed invention to practice during this time period.

### ii. ProDesign

Mr. DuVal testifies that on June 15, 1995, PrivTel paid ProDesign $5,000 to begin its first design phase of the claimed invention. Ex. 2017 ¶ 8(N)(4). Mr. Clement, however, testifies that ProDesign did not enter into a contract with PrivTel to develop software for the claimed invention until June 26, 1995. Ex. 2023 ¶ 4. Mr. Clement further testifies that, "[e]ven before the contract was signed, [he] began working diligently on the software for [the claimed invention] because of the relatively short amount of time before Mr. DuVal planned to demonstrated [the claimed invention] at the upcoming ONE BBSCON conference in August." Id. ¶ 11.

In its Reply, Oracle contends that Mr. Clements never corroborates that ProDesign actually performed work on the claimed invention between May 15, 1995, and June 15, 1995. Pet. Reply 8. Oracle also asserts that, in light of Mr. DuVal's testimony, ProDesign began its work to implement the claimed invention no earlier than June 15, 1995, because that was the date PrivTel made its initial payment of $5,000 to ProDesign. Id.

The testimony that CTC relies upon to explain the activities performed by ProDesign to implement the claimed invention is not specific as to facts and dates for the entire critical period during which diligence is required, particularly during the time period between May 15, 1995, and June 15, 1995. Although Mr. Clements testifies that he began working diligently on the software for the claimed invention prior to entering into a contract with PrivTel on June 26, 1995, he does not explain adequately the activities he performed on particular dates. Even if we were to assume that

24

IPR2013-00312
Patent 5,818,836

Mr. Clements began working diligently to implement the software for the claimed invention on June 15, 1995, the date PrivTel made its initial payment of $5,000 to ProDesign, the time period between May 15, 1995, and June 15, 1995, still remains unaccounted for.  Without some evidence that explains, in detail, the work performed by Mr. Clements on the software of the claimed invention between May 15, 1995, and June 15, 1995, we are not persuaded that ProDesign performed reasonably continuous activities to reduce the claimed invention to practice during this time period.

### iii.  SofTel

CTC indicates that, because SofTel was hired to develop a control system for the claimed invention that depends on some other subsystems, presumably developed by ICS and ProDesign, SofTel did not begin its work in earnest until July 1, 1995.  PO Resp. 45 (citing Ex. 2017 ¶ 8(L)(1); Ex. 2022 ¶¶ 7–16).  This is consistent with Mr. DuVal's testimony that PrivTel paid SofTel $3,000 on July 1, 1995, to begin designing the control system of the claimed invention.  Ex. 2017 ¶ 8(L)(3).

In its Reply, Oracle contends that CTC admits in its Patent Owner Response that SofTel did not begin working to implement the claimed invention until July 1, 1995, and its admission in that regard is consistent with the testimony proffered by Mr. DuVal.  Pet. Reply 8 (citing Ex. 2017 ¶ 8(L)(1)–(3)).

The testimony that CTC relies upon to explain the activities performed by SofTel to implement the claimed invention is not specific as to facts and dates for the entire critical period during which diligence is required, particularly during the time period between May 15, 1995, and July 1, 1995.  Indeed, Mr. DuVal's testimony that SofTel was awaiting the

25

IPR2013-00312
Patent 5,818,836

overall system architecture designed by ICS before it began its work in earnest on July 1, 1995 (Ex. 2017 ¶ 8(L)(1); *see* Tr. 28:4–29:12) constitutes persuasive evidence that SofTel did not perform reasonably continuous activities to reduce the claimed invention to practice between May 15, 1995, and July 1, 1995.

Based on the record before us, the testimony from Mr. DuVal regarding actual reduction to practice, as well as the testimony of Mr. Shinn, Mr. Clement, and Mr. Martin regarding the work performed by the three software developers hired by Mr. DuVal to implement the claimed invention, is not sufficiently specific as to facts and dates for at least the time period between May 15, 1995, and June 15, 1995, to demonstrate that Mr. DuVal was diligent during the entire critical period.

*4. Summary*

Applying the rule of reason, the evidence relied upon by CTC to corroborate Mr. DuVal's testimony does not demonstrate a continuous exercise of reasonable diligence during the entire critical period with respect to either constructive reduction to practice or actual reduction to practice, particularly during the time period between May 15, 1995, and June 15, 1995. As a result, CTC has not antedated Dezonno, which, in turn, qualifies as prior art to the '836 patent under 35 U.S.C. § 102(e).

Upon reviewing the unchallenged contentions and supporting evidence presented by Oracle in its Petition for the grounds of unpatentability based, in whole or in part, on Dezonno (Pet. 15–33; Ex. 1007 ¶¶ 11–17), we are persuaded that Oracle presents sufficient evidence to support a finding that Dezonno, either standing alone or in combination with Mosaic Handbook, discloses the claimed subject matter recited in claims 1,

IPR2013-00312
Patent 5,818,836

2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30.  We also are persuaded that
Oracle provides an articulated reason with a rational underpinning to
combine the teachings of Dezonno and Mosaic Handbook.  Pet. 32–33;
Ex. 1007 ¶ 17.  Therefore, based on the record before us, we conclude that
Oracle has demonstrated by a preponderance of the evidence that:
(1) claims 1, 2, 12, 13, 19, 22, 23, 26, 29, and 30 are anticipated by
Dezonno; (2) claims 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 are
obvious over Dezonno; and (3) claims 22 and 29 are obvious over the
combination of Dezonno and Mosaic Handbook.

### III.    CONCLUSION

Oracle has demonstrated by a preponderance of the evidence that
claims 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 of the '836 patent are
unpatentable based on the grounds of unpatentability set forth in the table
below.

| Challenged Claims | Basis | Reference(s) |
|---|---|---|
| 1, 2, 12, 13, 19, 22, 23, 26, 29, and 30 | § 102(e) | Dezonno |
| 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 | § 103(a) | Dezonno |
| 22 and 29 | § 103(a) | Dezonno and Mosaic Handbook |

### IV.    ORDER

In consideration of the foregoing, it is

ORDERED that Oracle has shown by a preponderance of the evidence
that claims 1, 2, 8, 12, 13, 15, 16, 19, 22, 23, 26, 29, and 30 of the '836
patent are unpatentable; and

27

IPR2013-00312
Patent 5,818,836

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00312
Patent 5,818,836

For PETITIONERS:
James M. Heintz
DLA Piper LLP (US)
Oracle-IPRP@dlapiper.com

Mitchell G. Stockwell
Kilpatrick Townsend & Stockton LLP
mstockwell@kilpatricktownsend.com

For PATENT OWNER:

Peter J. Ayers
LEE & HAYES, PLLC
peter@leehayes.com

Craig J. Yudell
Yudell Isidore Ng Russell PLLC
Yudell@yudellisidore.com

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 9th day of March, 2015, I caused this Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Mark D. Fowler
DLA PIPER US LLP
2000 University Avenue
East Palo Alto, California  94303
(650) 833-2048

John Guaragna
DLA PIPER US LLP
401 Congress Avenue, Suite 2500
Austin, Texas  78701
(512) 457-7125

James M. Heintz
DLA PIPER US LLP
One Fountain Square
11911 Freedom Drive
Reston, Virginia  20190

*Counsel for Appellees Oracle
    Corporation and Oracle OTC
    Subsidiary, LLC*

Mitchell G. Stockwell
David C. Holloway
Lindsay M. Hopkins
KILPATRICK TOWNSEND &
    STOCKTON LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia  30309
(404) 815-6500

*Counsel for Appellee
    Yellowpages.com, LLC*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Brief Appellant will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/ Peter J. Ayers
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [ X ] this brief contains [*7,946*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

   [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: March 9, 2015                           /s/ Peter J. Ayers
                                               *Counsel for Appellant*