

**DLA Piper LLP (US)**
401 B Street, Suite 1700
San Diego, California  92101-4297
www.dlapiper.com

Stanley J. Panikowski
stanley.panikowski@dlapiper.com
**T**  619.699.2643
**F**  619.764.6643

September 21, 2016

*VIA ECF*

Hon. Daniel E. O'Toole
Circuit Executive and Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place NW, Room 401
Washington, DC 20439

**Re:    Rule 28(j) Citation of Supplemental Authority in**
***Click-to-Call Technologies, LP v. Oracle Corp.*, Appeal No. 15-1242**

Dear Mr. O'Toole:

This Court's recent decision in *Wi-Fi One, LLC v. Broadcom Corp.*, No. 2015-1944 (Sept. 16, 2016), mandates dismissal of this appeal for lack of jurisdiction.

In *Wi-Fi One*, the Court considered the same jurisdictional issue presented in this appeal:  whether the Patent Trial and Appeal Board's decisions applying 35 U.S.C. § 315(b)'s one-year limitations period are final and nonappealable under 35 U.S.C. § 314(d).  *See* slip op. at 5-9.  The Court held that such decisions are final and nonappealable based on the Supreme Court's recent decision in *Cuozzo Speed Technologies, LLC v. Lee*, 136 S. Ct. 2131 (2016), and this Court's earlier decision in *Achates Reference Publishing, Inc. v. Apple Inc.*, 803 F.3d 652 (Fed. Cir. 2015).

In *Achates*, this Court held that § 314(d) "prohibits this court from reviewing the Board's determination to initiate IPR proceedings based on its assessment of the time-bar of § 315(b), even if such assessment is reconsidered during the merits phase of proceedings and restated as part of the Board's final written decision." 803 F.3d at 658.



Hon. Daniel E. O'Toole
September 21, 2016
Page Two

In *Wi-Fi One*, this Court explained that *Achates* remains good law after *Cuozzo*:

> We see nothing in the *Cuozzo* decision that suggests
> *Achates* has been implicitly overruled.  The Supreme
> Court stated that the prohibition against reviewability
> applies to 'questions that are closely tied to the
> application and interpretation of statutes related to the
> Patent Office's decision to initiate inter partes review.'
> Section 315 is just such a statute.  The time-bar set forth
> in section 315 addresses who may seek inter partes
> review, while section 312 governs what form a petition
> must take.  Both statutes govern the decision to initiate
> inter partes review.

Slip op. at 8.

*Wi-Fi One* applies equally here.  On November 12, 2015, this Court dismissed this appeal for lack of jurisdiction based on *Achates*.  The Supreme Court subsequently remanded this appeal for consideration of the jurisdictional issue in light of *Cuozzo*.  This Court's holding in *Wi-Fi One* confirms that *Cuozzo* requires the same result as before:  dismissal for lack of appellate jurisdiction.  *See* Appellees' Supplemental Brief filed on August 19, 2016.



Hon. Daniel E. O'Toole
September 21, 2016
Page Three


Respectfully submitted,

**DLA Piper LLP (US)**

*/s/ Stanley J. Panikowski*

Stanley J. Panikowski

*Attorneys for Appellees*
*Oracle Corporation and*
*Oracle OTC Subsidiary LLC*

Submitted on behalf of all Appellees

cc:    Counsel of Record

WEST\271636771.1

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

---

**WI-FI ONE, LLC,**
*Appellant*

**v.**

**BROADCOM CORPORATION,**
*Appellee*

---

2015-1944

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2013-00601.

---

Decided: September 16, 2016

---

DOUGLAS AARON CAWLEY, McKool Smith, PC, Dallas, TX, argued for appellant. Also represented by DONALD PUCKETT, Nelson Bumgardner PC, Fort Worth, TX; PETER J. AYERS, Lee & Hayes, PLLC, Austin, TX.

DOMINIC E. MASSA, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, argued for appellee. Also represented by KEVIN A. GOLDMAN, ZACHARY P. PICCOLOMINI, KATIE SAXTON.

---

Before DYK, BRYSON, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* BRYSON.

Concurring opinion filed by *Circuit Judge* REYNA.

BRYSON, *Circuit Judge*.

This is an appeal from a decision of the Patent Trial and Appeal Board in an inter partes review. The Board held various claims of a patent owned by Wi-Fi One, LLC ("Wi-Fi"), to be anticipated. We affirm.

I

A

The patent at issue in this case, U.S. Patent No. 6,772,215 ("the '215 patent"), is directed to a method for improving the efficiency by which messages are sent from a receiver to a sender in a telecommunications system to advise the sender that errors have occurred in a particular message.

In the technology described in the patent, data is transmitted in discrete packets known as Protocol Data Units ("PDUs"). The useful data or "payload" in those packets is carried in what are called user data PDUs ("D-PDUs"). Each D-PDU contains a sequence number that uniquely identifies that packet. The sequence number allows the receiving computer to determine when it either has received packets out of order or has failed to receive particular packets at all, so that the receiver can correctly combine the packets in the proper order or direct the sender to retransmit particular packets as necessary.

The receiver uses a different type of packet, a status PDU ("S-PDU"), to notify the sender of the D-PDUs it failed to receive. The '215 patent is concerned with organizing the information contained in S-PDUs efficiently so as to minimize the size of the S-PDUs, thus conserving bandwidth.

The patent discloses a number of methods for encoding the sequence numbers of missing packets in S-PDUs. Some of those methods use lists that indicate which packets are missing by displaying the ranges of the sequence numbers of the missing packets. Other methods are based on bitmaps that use binary numbers to report on the status of a fixed number of packets relative to a starting point.

Depending on how many packets fail to be properly delivered and the particular sequence numbers of the errant packets, different methods can be more or less efficient for encoding particular numbers and ranges of errors. In order to leverage the benefits of the different encoding methods, the patent discloses an S-PDU that can combine multiple message types in an arbitrary order, with "no rule on the number of messages or the type of messages that can be included in the S-PDU." '215 patent, col. 7, ll. 55-57. Using that technology, S-PDUs can be constructed with a combination of the encoding types best suited for the particular errors being encoded, so that the S-PDU can be more compact than an S-PDU that uses a single encoding type.

B

In 2013, Broadcom petitioned for inter partes review of the '215 patent, challenging numerous claims. Prior to the institution decision, Wi-Fi argued that Broadcom was barred from seeking review of the patent. Wi-Fi argued that Broadcom was in privity with certain entities that were involved in parallel district court litigation involving the '215 patent, and that because those entities would be time-barred from seeking inter partes review of the '215 patent, Broadcom was time-barred as well. *See* 35 U.S.C. § 315(b).

Wi-Fi filed a motion seeking discovery designed to support its argument, but after briefing the Board denied the motion. It found that Wi-Fi "has not provided evi-

dence to show that there is more than a mere possibility that the sought-after discovery even exists" or "that the sought-after discovery has more than a mere possibility of producing useful evidence on the crucial privity factor"— control of the district court litigation by Broadcom in a way that would foreclose it from seeking inter partes review.

After the Board denied Wi-Fi's petition for rehearing, Wi-Fi petitioned this court for a writ of mandamus. This court denied the petition. *In re Telefonaktiebolaget LM Ericsson*, 564 F. App'x 585 (Fed. Cir. 2014).

The Board instituted inter partes review of the '215 patent, finding that there was a reasonable likelihood that the challenged claims were anticipated by U.S. Patent No. 6,581,176 to Seo. The Board declined to institute review based on another reference because it found that reference would be redundant in light of Seo.

Seo teaches improvements to what are known as negative acknowledgement ("NAK") frames. NAK frames are sent by the receiving unit to inform the transmitting unit that frames sent by the transmitting unit were misdelivered. The Seo method uses a single packet to provide information about multiple misdelivered frames, so that "only one NAK control frame for all missed user data frames is transmitted to a transmitting station to require a retransmission of the missed user data when a timer for an NAK is actually expired." Seo, col. 5, ll. 32-35.

Seo describes the structure of the disclosed NAK frames. The frames include a field called "NAK_TYPE" that indicates how the NAK frame represents missing frames. If the NAK_TYPE is set to "00," then the missing frames are encoded as a list, and the frame requests retransmission of all user data frames between the first missing frame and the last, represented by the "FIRST" and "LAST" values. If the NAK_TYPE is set to "01," then the NAK frame transmits information about the missing

transmitted frames using a bitmap.    In that case, the
NAK frame contains the field "NAK_MAP_SEQ" to identi-
fy the starting point of the bitmap and the field
"NAK_MAP" to transmit the bitmap.

Before the Board, Wi-Fi argued that the NAK_TYPE
field disclosed in Seo is not a "type identifier field" and
that Seo therefore does not satisfy the type identifier field
limitation of the '215 patent.  Wi-Fi further argued that,
even if Seo discloses that feature, the NAK_TYPE field is
not found within a "message field," as required by the
claims at issue.  The Board rejected those arguments,
found that Seo disclosed all the limitations of the chal-
lenged claims of the '215 patent, and therefore held those
claims to be unpatentable.  The Board also rejected
Wi-Fi's argument that claim 15 of the '215 patent re-
quired some sort of "length field," which Seo did not
disclose.  Finally, the Board held that Wi-Fi had not
shown that Broadcom was in privity with the district
court defendants, and therefore Broadcom was not barred
from filing a petition for inter partes review.

## II

On appeal, Wi-Fi continues to press its argument that
Broadcom was barred from petitioning for inter partes
review because it was in privity with a time-barred dis-
trict court litigant.

The Board may not institute inter partes review "if
the petition requesting the proceeding is filed more than 1
year after the date on which the petitioner, real party in
interest, or privy of the petitioner is served with a com-
plaint alleging infringement of the patent."  35 U.S.C.
§ 315(b).  To determine whether a petitioner is in privity
with a time-barred district court litigant, the Board
conducts a flexible analysis that "seeks to determine
whether the relationship between the purported 'privy'
and the relevant other party is sufficiently close such that
both should be bound by the trial outcome and related

estoppels." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012).

This court has previously addressed whether a patent owner can argue on appeal that the Board improperly allowed a privy of a time-barred district court litigant to pursue an inter partes review. The statute governing the Board's institution of inter partes review provides that "[t]he determination by the Director whether to institute an inter partes review under this section shall be final and nonappealable." 35 U.S.C. § 314(d). In *Achates Reference Publishing, Inc. v. Apple Inc.*, 803 F.3d 652, 658 (Fed. Cir. 2015), we held that section 314(d) "prohibits this court from reviewing the Board's determination to initiate IPR proceedings based on its assessment of the time-bar of § 315(b), even if such assessment is reconsidered during the merits phase of proceedings and restated as part of the Board's final written decision."

Wi-Fi does not dispute that *Achates* renders its challenge to the Board's timeliness ruling nonappealable if *Achates* is still good law. What Wi-Fi argues is that the Supreme Court's recent decision in *Cuozzo Speed Technologies, LLC v. Lee*, 136 S. Ct. 2131 (2016), implicitly overruled *Achates*.[1] In *Cuozzo* the patent owner challenged the Board's institution decision, arguing that the Board should not have instituted inter partes review, because the petition failed to "identif[y], in writing and

---

[1] Wi-Fi also argues that even in the absence of a Supreme Court overruling, we have a license to reconsider *Achates* because the decision was flawed. We decline Wi-Fi's invitation. "We are bound by prior Federal Circuit precedent 'unless relieved of that obligation by an en banc order of the court or a decision of the Supreme Court.'" *MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1291 (Fed. Cir. 2015) (quoting *Deckers Corp. v. United States*, 752 F.3d 949, 959 (Fed. Cir. 2014)).

with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." 35 U.S.C. § 312(a)(3). Based on the language of section 314(d), the Supreme Court held that the Board's decision on that issue was unreviewable. *Cuozzo*, 136 S. Ct. at 2139. In the course of its opinion, the Court clarified the scope of the preclusion of review:

> [I]n light of § 314(d)'s own text and the presumption favoring review, we emphasize that our interpretation applies where the grounds for attacking the decision to institute inter partes review consist of questions that are closely tied to the application and interpretation of statutes related to the Patent Office's decision to initiate inter partes review. This means that we need not, and do not, decide the precise effect of § 314(d) on appeals that implicate constitutional questions, that depend on other less closely related statutes, or that present other questions of interpretation that reach, in terms of scope and impact, well beyond "this section." Thus, contrary to the dissent's suggestion, we do not categorically preclude review of a final decision where a petition fails to give "sufficient notice" such that there is a due process problem with the entire proceeding, nor does our interpretation enable the agency to act outside its statutory limits by, for example, canceling a patent claim for "indefiniteness under § 112" in inter partes review. Such "shenanigans" may be properly reviewable in the context of § 319 and under the Administrative Procedure Act, which enables reviewing courts to "set aside agency action" that is "contrary to constitutional right," "in excess of statutory jurisdiction," or "arbitrary [and] capricious."

*Id.* at 2141-42 (citations omitted).

We see nothing in the *Cuozzo* decision that suggests *Achates* has been implicitly overruled. The Supreme Court stated that the prohibition against reviewability applies to "questions that are closely tied to the application and interpretation of statutes related to the Patent Office's decision to initiate inter partes review." Section 315 is just such a statute. The time-bar set forth in section 315 addresses who may seek inter partes review, while section 312 governs what form a petition must take. Both statutes govern the decision to initiate inter partes review.

Wi-Fi's arguments to the contrary are unavailing. Wi-Fi argues that *Cuozzo* "tied the limitation of judicial review to the Patent Office's ability to make its substantive patentability determination as embodied in § 314(a)." To the extent that Wi-Fi means to suggest that the Court limited the statutory bar against judicial review to the Board's substantive determination at the time of institution, i.e., whether a particular reference raises a reasonable likelihood of anticipating or rendering a challenged claim obvious, we disagree. The Supreme Court extended the preclusion of judicial review to statutes related to the decision to institute; it did not limit the rule of preclusion to substantive patentability determinations made at the institution stage, as the facts of *Cuozzo* itself make clear. Subsection 312(a)(3), which the Court addressed in *Cuozzo*, is not related to substantive patentability, but instead is addressed to the conditions for seeking review—in that case, the level of specificity required in the petition.

Wi-Fi also argues that the reviewability ban is limited to issues arising under section 314, because of the statutory text providing that a determination by the Director whether to institute inter partes review "under this section" is not reviewable. 35 U.S.C. § 314(d). This court explicitly rejected that argument in *Achates*. *See* 803 F.3d at 658 ("Finally, Achates also contends that § 314(d) does not limit this court's review of the timeliness of Apple's

petition under § 315, because § 314(d) says '[t]he determination by the Director whether to institute an inter partes review *under this section* shall be final and nonappealable' (emphasis added). Achates' reading is too crabbed and is contradicted by this court's precedent. The words 'under this section' in § 314 modify the word 'institute' and proscribe review of the institution determination for whatever reason."). Nothing in *Cuozzo* casts doubt on that interpretation of the statute, especially in light of the fact that the Supreme Court held that the particularity requirement, which is contained in section 312, is non-appealable.

Wi-Fi next argues that time-bar issues should be reviewable because Board practice allows parties to argue those issues at trial. That argument, too, was rejected in *Achates*. 803 F.3d at 658 ("That the Board considered the time-bar in its final determination does not mean the issue suddenly becomes available for review or that the issue goes to the Board's ultimate authority to invalidate—the Board is always entitled to reconsider its own decisions."). Wi-Fi has not pointed to anything in *Cuozzo* that casts doubt on that reasoning.

Finally, Wi-Fi argues that the Board's denial of its request for discovery on the time-bar issue is an example of the "shenanigans" that the Supreme Court in *Cuozzo* suggested would be reviewable. We disagree. The Board simply declined to grant discovery because Wi-Fi had not made a sufficient showing to support its request. To hold that such a ruling falls within the narrow exception to the Supreme Court's unreviewability holding would render routine procedural orders reviewable, contrary to the entire thrust of the *Cuozzo* decision.

## III

Wi-Fi also challenges the Board's substantive determination that Seo anticipates the '215 patent. Wi-Fi brings three separate challenges: that Seo does not dis-

close a type identifier field, that Seo does not disclose a type identifier field within a message field, and that the Board misconstrued the term type identifier field.

### A

Claim 1 of the '215 patent, which is representative, provides as follows:

> A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:
>
> sending a plurality of first data units over a communication link;
>
> receiving said plurality of first data units; and
>
> responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field.

Wi-Fi argues that Seo does not disclose a type identifier field because it discloses only a single type of message, and that the single type of message contains fields for encoding errors as both lists and bitmaps. Wi-Fi relies on Figure 4 of Seo, shown below:

| FIELD | LENGTH (BITS) |
|---|---|
| SEQ | 8 |
| CTL | 4 |
| RE_NUM | 2 |
| NAK_TYPE | 2 |
| NAK_SEQ | 4 |
| L_SEQ_HI | 4 |
|  |  |
| FIRST | 12 |
| LAST | 12 |
| FCS | 16 |
| PADDING | VARIABLE |
|  |  |
| NAK_Map_Count | 2 |
| NAK_Map |  |
| NAK_Map_SEQ | 12 |
| NAK_Map | 8 |

Based on Figure 4, Wi-Fi argues that the data structure in Seo contains fields for the list type of coding, which are entitled FIRST, LAST, FCS, and PADDING, and fields for the bitmap type of coding, which are entitled NAK_Map_Count, NAK_Map_SEQ, and NAK_Map.

Wi-Fi argues that in Seo all fields are always present, either as useful values or as "padded zeros," i.e., place-holders, regardless of the value of the NAK_TYPE field. Therefore, Wi-Fi argues, the NAK_TYPE field does not

function as a type identifier field that identifies the type of coding used in Seo's data structure.

The Board rejected that argument, relying on the disclosure in Seo that certain fields "exist" depending on the value of the NAK_TYPE field. *See* Seo, col. 5, ll. 54-57 ("When a value of the field NAK_TYPE is '00', the receiving station requests a retransmission of missed user data frames numbered a field FIRST through a field LAST."); col. 6, ll. 18-22 ("If a value of the field NAK_TYPE is '01', the field NAK_MAP_COUNT exists."). Based on those portions of the Seo specification, the Board concluded that Seo discloses a control frame "that includes certain fields only when NAK_TYPE is '00' and includes other fields only when NAK_TYPE is '01.'" Accordingly, the Board rejected Wi-Fi's argument that NAK_TYPE is not a type identifier field.

The Board also credited the testimony of Broadcom's expert that it would not make sense to include unnecessary fields in a message. It was entirely reasonable for the Board to read the term "exist" in Seo in that way. Substantial evidence therefore supports the Board's conclusion that Seo discloses the type identifier field feature recited in the '215 patent.

## B

Wi-Fi also argues that even if Seo discloses a type identifier field, Seo does not anticipate the '215 patent, because the NAK_TYPE field in Seo is part of the S-PDU header rather than the message field, as required by the claims.

The Board rejected that argument, finding that the '215 patent does not require the type identifier field to be in any particular part of the message, and that, in any event, Seo's NAK_TYPE field was included in the message field. We agree with the Board. Nothing in the '215 patent specifies whether the type identifier field must be

located in the header or any other specific part of the message.

Wi-Fi also argues that a prior amendment to claim 1 shows that the claim is drawn to the distinction between the message body and the header. During the prosecution of the '215 patent, Wi-Fi offered the following amendment:

> said message field including <u>a type identifier field and</u> at least one of ~~a type identifier field~~, a sequence number field, a length field, and a content field.

That amendment moved the type identifier field from being one of four optional fields to being a required field, accompanied by at least one of the three remaining optional fields.

On appeal, Wi-Fi argues that the amendment "distinguish[es], among other things, fields that were included in the header of the PDU such as the 'PDU_format' field shown in the admitted prior art." That argument is meritless. The type identifier field was identified as part of the message field before and after the amendment, so the amendment had no effect on where in the packet the type identifier field had to be located. The amendment simply made that term a required feature, rather than one of the options listed in the "at least one" clause.

That understanding is confirmed by the applicants' remarks accompanying the amendment. The applicants distinguished a prior art reference by stating that amended claim 1 "provides the type identifier field and at least one of a sequence number field, a length field, and a content field." Because there is no support in the patent or the prosecution history for Wi-Fi's distinction between the presence of the type identifier field in the message field and in the header, the Board was correct to reject Wi-Fi's argument.

C

Wi-Fi next argues that the Board erred in construing the phrase "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field" to mean "a field of a message that identifies the type of that message." Wi-Fi argues that the Board's construction failed to specify that a type identifier field must distinguish the type of message from a number of different message types.

We agree with the Board that Wi-Fi's interpretation does no more than restate what is already clear from the Board's construction—that a type identifier field must distinguish between different message types. Wi-Fi's real quarrel is not with the Board's claim construction, but with the Board's conclusion that Seo discloses different message types. As we have noted, the Board's conclusion that Seo discloses different message types is supported by substantial evidence.

IV

Finally, Wi-Fi challenges the Board's analysis of claim 15. That claim reads:

A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of, a length field, a plurality of erroneous sequence number-fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associ-

ated with a respective one of said plurality of erroneous sequence number length fields.

Wi-Fi argues that claim 15, properly construed, requires that the message field contain either a "length field" or an "erroneous sequence number length field." Because Seo does not disclose length fields of either type, Wi-Fi argues that it does not anticipate claim 15.

Wi-Fi's argument is based on the structure of the "at least one of" clause. That clause requires that at least one of the following be present: "a length field," "a plurality of erroneous sequence number fields," or "a plurality of erroneous sequence number length fields." The second entry on the list, "a plurality of erroneous sequence-number fields," is not by itself a type of length field. However, the final clause of that limitation provides "each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields." That clause, Wi-Fi argues, requires that each erroneous sequence number field must be associated with an erroneous sequence number length field. For that reason, Wi-Fi contends that some sort of length field is required to meet claim 15.

Broadcom argues that the "each of said" clause requires that each of the erroneous sequence number length fields must be associated with an erroneous sequence number field, not the other way around. Therefore, in Broadcom's view, an erroneous sequence number field can stand alone, without an accompanying erroneous sequence number length field; for that reason, according to Broadcom, claim 15 does not require the presence of a length field in all cases.

Wi-Fi's is the better reading of the text of the claim. The structure of the "at least one of" limitation is best understood by stripping it to its essence: substituting A for the length field, B for the plurality of erroneous sequence number fields, and C for the erroneous sequence

number length fields. So viewed, the claim by its terms would require one of A, B, or C, except that each of B must be associated with one of C. That reading is at odds with Broadcom's, which would require each of C to be associated with one of B.

While the text of the limitation, standing alone, favors Wi-Fi's interpretation, we conclude that Wi-Fi's interpretation does not make sense in light of the specification, and thus that Broadcom's interpretation must be accepted as correct.

The specification of the '215 patent explains the properties and purpose of the length field. The length field is used in open-ended data structures to provide information about the data structure, such as the number of lists or bitmaps that are present in a packet, or the length of the bitmaps that are used to represent errors. *See* '215 patent, col. 2, ll. 56-62; col. 6, ll. 25-34; col. 7, ll. 52-65. Because the length of a particular message can be fixed by the rules of the protocol, a length field is not a required feature of the invention. *See id.*, col. 7, ll., 57-60 ("For this exemplary embodiment, each such message includes a type identifier, and the length is either fixed or indicated by a length field for each specific message.").

The specification also describes the purpose of the erroneous sequence number fields and the erroneous sequence number length fields. The specification explains that one method for representing errors "is to include a field after each list element which determines the length of the error, instead of indicating the length of the error with an 'ending' [sequence number]." '215 patent, col. 7, ll. 31-33. Using that method, strings of consecutive errors are represented with an erroneous sequence number that marks the beginning of the error, followed by an erroneous sequence number length field that marks how long the error persists. That method is generally more efficient than representing an error sequence by its starting

and ending point because "[i]n most systems, the size of the length field would then be substantially smaller than the size of the [sequence number] field." *Id.*, col. 7, ll. 33-35.

Figure 9 of the '215 patent shows how that method would represent the failed transmission of a series of packets numbered 51-77:

| Field | Field Value | | Field |
|---|---|---|---|
| | *Decimal* | *Bits* | size |
| LIST' | N/A' | 01 | 2 |
| LENGTH | 1 | 00001 | 5 |
| $SN_1$ | 51 | 000000110011 | 12 |
| $L_1$ | 27 | 11011 | 5 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

The erroneous sequence number field, $SN_1$, shows that the error sequence begins at sequence number 51. The erroneous sequence number length field, $L_1$, shows that the error extends for 27 packets, covering packets 51 through 77.

Based on those descriptions of embodiments of the invention, it is clear that an erroneous sequence number length field is useful only when it is paired with an erroneous sequence number field, while an erroneous sequence number field can be useful without an accompanying erroneous sequence number length field. Thus, an erroneous sequence number field can stand alone, but an erroneous sequence number length field cannot.

The '215 specification makes clear that an erroneous sequence number field can be used absent an erroneous sequence number length field. As examples, Figure 10

shows four erroneous sequence numbers that are used to indicate errors, and Figure 12 shows a bitmap that contains an erroneous sequence number field to indicate where the bitmap begins.  Both contain erroneous sequence number fields, but not erroneous sequence number length fields, thus supporting the Board's construction of claim 15.

By contrast, an erroneous sequence number length field can indicate an error only by reference to a starting point, which would be represented by an erroneous sequence number field.  The '215 patent discloses no examples of an erroneous sequence number length field without an accompanying erroneous sequence number field, for the simple reason that an erroneous sequence number length field standing alone would not convey sufficient information to determine what packets must be retransmitted.

Based on the full teaching of the specification, we conclude that Wi-Fi's proposed construction of claim 15 is unreasonable.  It would allow an erroneous sequence number length field to be present without an erroneous sequence number field, which the specification indicates would not work, while requiring all erroneous sequence number fields to be associated with erroneous sequence number length fields, which the patent teaches is not necessary.  The Board's construction, on the other hand, comports with what the patent teaches about the number and length fields.  Even though the language of claim 15, standing alone, provides some support for Wi-Fi's interpretation, we hold that in the end the claim must be read as the Board construed it in order to be faithful to the invention disclosed in the specification.

Accordingly, because claim 15, as properly construed, does not require a length field, we hold that the Board was correct to conclude that Seo anticipates that claim.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

———————————

**WI-FI ONE, LLC,**
*Appellant*

**v.**

**BROADCOM CORPORATION,**
*Appellee*

———————————

2015-1944

———————————

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2013-00601.

———————————

REYNA, *Circuit Judge,* concurring.

I agree with the majority that Wi-Fi One has neither shown Broadcom to be in privity with the Texas Defendants nor a real party in interest in the Texas litigation.

I write separately to convey my sense that this Court has jurisdiction to address the time bar question despite the statutory requirement that the Board's institution decisions "shall be final and nonappealable."  35 U.S.C. § 314(d).  I believe that the legal distinction that exists between an "institution" decision and a final decision compels that the decision in this case is a final decision, not an institution decision.  A final decision concerning the time bar set forth by 35 U.S.C. § 315(b) should be subject to review.

DISCUSSION

Our opinion in *Achates Reference Publishing v. Apple, Inc.*, 803 F.3d 652 (Fed. Cir. 2015), holds that a time bar decision is not reviewable—a holding that I believe should be reconsidered by the *en banc* court. The § 315(b) time bar falls squarely within the exceptions acknowledged by this court in *Achates*. "[E]ven when the statutory language bars judicial review, courts have recognized that an implicit and narrow exception to the bar on judicial review exists for claims that the agency exceeded the scope of its delegated authority or violated a clear statutory mandate." *Achates*, 803 F.3d at 658 (*quoting Hanauer v. Reich*, 82 F.3d 1304, 1307 (4th Cir. 1996)).

*Achates* renders § 315(b) toothless. For example, if the Board simply chose to ignore a time bar issue altogether, there would be no avenue for appellate review. I do not believe that is what Congress intended. Rather, I believe § 314(d) was intended to ensure that institution decisions were truly preliminary, not to capture all statutory limitations on the inter partes review ("IPR") process.

Here, the statutory language explicitly allows review of the Board's final decision,[1] and in this case we are faced with an argument that the Board exceeded the scope of its statutory authority both in instituting the IPR and in issuing its final decision.

It is clear that not every decision on whether there exists legal basis to commence an IPR is an unreviewable determination by the Director to institute as contemplated under § 314(d). For example, the Supreme Court has noted that § 314(d) may not bar consideration of a constitutional question, but that it "does bar judicial review of

---

[1]    A party to an IPR "may appeal the Board's decision" to this court. 35 U.S.C. § 141(c).

the kind of mine-run claim" of whether the grounds stated by the PTO in its institution decision matched the grounds in the original petition for IPR. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2136 (2016). The Court noted that Congress did not intend for a final IPR decision to "be unwound under some minor statutory technicality related to its preliminary decision to institute inter partes review." *Id.* at 2140.

The time-bar question is not a "mine-run" claim, and it is not a mere technicality related only to a preliminary decision concerning the sufficiency of the grounds that are pleaded in the petition. *See Cuozzo*, 136 S. Ct. at 2136. Indeed, the time bar question is immaterial to the Board's initial determination of whether there is a reasonable likelihood the petitioner would prevail on the merits. Rather, the time bar deprives the Board of jurisdiction to consider whether to institute a review after one year has expired from the date a petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent. 35 U.S.C. § 315(b). Compliance with the time bar is part of the statutory basis on which the final decision rests, despite the fact that the question is first evaluated at the outset of the proceeding and noticed as part of the institution decision.

*Cuozzo* explicitly notes that its holding does not "enable the agency to act outside its statutory limits" and that such "shenanigans" are properly reviewable. 136 S. Ct. at 2141–42. That admonition compels us to review allegations that the Board has ignored, or erred in the application of, the statutory time bar.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 21, 2016, I electronically filed the

foregoing **RULE 28(J) CITATION OF SUPPLEMENTAL AUTHORITY** with

the Court's CM/ECF filing system, which constitutes service, pursuant to Fed. R.

App. P. 25(c), Fed. Cir. R. 25(a), and the Court's Administrative Order Regarding

Electronic Case Filing 6(A) (May 17, 2012).


*/s/ Stanley J. Panikowski*
Stanley J. Panikowski
DLA Piper LLP (US)
401 B Street, Ste. 1700
San Diego, CA 92101
Ph:  619.699.2700